[Crim. No. 6843. In Bank. Mar. 15, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. ALLEN DITSON and CARLOS GONZALES CISNEROS, Defendants and Appellants.

Allen Ditson, in pro. per., William A. Drake, under appointment by the Supreme Court, Harold J. Ackerman, W. M. Brooks and Hugh R. Manes for Defendants and Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gordon Ringer, Deputy Attorney General, for Plaintiff and Respondent.

SCHAUER, J.—Defendants Ditson and Cisneros appeal (by operation of Pen. Code, § 1239, subd. (b)) from judgments of death imposed pursuant to jury verdicts finding each of them guilty of murder in the first degree and fixing the penalty at death, and from orders denying their motions for new trial and for reduction of the penalty or the degree of the offense.

Defendants contend that they were denied a fair trial and due process of law by reason of the admission of certain evidence (testimony and photographs relating to the finding of the remains of the murder victim) assertedly discovered by the

police as a result of a confession by Cisneros made during or after a lie detector test which he had voluntarily agreed to take. The trial court on defendants' motion excluded the confession as involuntary. However, the court immediately followed the exclusionary ruling with a declaration that ''The mere exclusion of the confession to my mind does not exclude the evidence secured by the People as a result of it,'' and proceeded to follow that theory in subsequent rulings on admissibility of certain relevant evidence. As hereinafter shown the quoted declaration portrays a view of the law once widely accepted but which in recent years has been rejected by the Supreme Court of the United States. Since the matter involves due process a conviction by means obnoxious to the federal concept cannot be sustained. Accordingly the entire record must be examined to determine, among other things, whether any error has been prejudicial to defendants or any procedure has operated to deprive either of them of any essential element of a fair trial or due process of law.

To reach our ultimate conclusion with fairness both to the defendants and the plaintiff, and to correct the untenable views of the law which contributed to certain rulings, we consider the contentions of defendants from two separate standpoints: 1. With an assumption (without deciding) that the trial court's exclusionary ruling was correct. 2. With an analysis of the circumstances of the confession as well as of the other evidence in the record, and of the pertinent rules which should have been considered in determining admissibility of (a) the confession and (b) its asserted products. Upon such consideration of the problems presented it develops that from either standpoint the announced untenable view of the law becomes immaterial. It is inconsequential here because (1) defendants' contentions as to the sources and effect of essential evidence are without factual support and (2) defendants have not, on any reasonable interpretation of the evidence whether excluding or including that claimed to have been a product of the confession, been denied any essential element of a fair trial or due process. Defendants also complain of certain other rulings on the admissibility of evidence and of a number of instructions given and refused. After consideration of each contention we conclude that the record reveals no prejudicial error; that the proof of guilt entirely apart from evidence related to the confession is overwhelming; and that the judgments of conviction should be affirmed.

Most of the evidence is undisputed but because of the nature of the problems presented must be summarized or recounted in sufficient compass to show the issues and manifest the grounds of decision.

The record portrays the lurid story of an episode in the life of a gang of criminal conspirators organized and directed by defendant Allen Ditson. Ditson is described as a slight, quiet, cool, soft-spoken intellectual who owned and operated a jewelry store and watch repair shop in North Hollywood, Los Angeles County. He occasionally bought wrecked automobiles, and repaired and sold them; and he bought or procured guns, including one machine gun, assertedly for a man who was planning a trip into headhunters' territory. But all of these endeavors were side lines; his more active business, during the time here relevant, was as the organizer and director of a gang of criminals who sometimes engaged in burglary but whose specialty was the more profitable armed robbery. The guiding principle of life which Ditson sought to instill in his recruits was that while on a job each man must carry out his "assignment" and was on his own; if he was caught he was to keep silent and Ditson would provide a lawyer; but above all, each should remember that a "squealer" or a blackmailer should be eliminated.

The evidence also tells the story of Carlos Gonzales Cisneros, whose mother apparently had been an epileptic and had died of tuberculosis. Carlos had spent most of his infancy and early boyhood in foundling homes. In the course of time he gained common school education up to the tenth grade. In 1950, at the age of 17, he left school and had various employments including more than seven years with Lockheed Aircraft factory, where he earned $85 a week as a sheetmetal worker. He married an apparently loving wife and had four children. While working the swing shift at Lockheed, and at about 24 years of age, he met Ditson. The approach to criminal activity was gradual, but Ditson explained to Carlos that he would like to see him making more money and not working so hard—that "it would be nice to see him driving a Cadillac." Eventually, Carlos became Ditson's first lieutenant, and had a Cadillac, and then another. He drove the latter on his most tragic assignment—to eliminate a fellow gang member who assertedly was a blackmailer and was suspected of being a potential "squealer."

There were a good many other "boys" in Ditson's gang, from time to time. They included Eugene D. Bridgeford and

Weyland Keith Slaten and Robert H. Ward. Generally, each did the work assigned to him and when caught kept his mouth shut and pleaded guilty or was "sprung," but finally a mistake was made, and one mistake led to another. As a result of the mistakes, on July 12, 1960, Ditson, Cisneros, Bridgeford, and Slaten by Grand Jury indictment were charged with, and they were subsequently brought to trial for, the murder of Robert H. Ward.

To this indictment each defendant entered a plea of not guilty. Ditson also entered a plea of not guilty by reason of insanity, but withdrew the plea after court-appointed alienists reported that he refused to cooperate with them. Ditson and Cisneros were at first represented by the same attorney, but when that attorney and Cisneros learned—or, perhaps more accurately, comprehendingly accepted the fact—that the latter's interests were in conflict with those of Ditson another attorney was appointed to represent Cisneros. Shortly thereafter an additional plea of not guilty by reason of insanity was entered in Cisneros' behalf.[1] After the trial had started but before the defendants had "gone into their defense" the court, on motion of the prosecuting attorney as authorized by Penal Code section 1099, discharged defendant Bridgeford (who was already serving a first degree robbery sentence resulting from a Ditson enterprise) in order that he might be called as a witness for the People. The jury found Slaten not guilty and Ditson and Cisneros guilty of murder in the first degree; the latter are the appellants. Cisneros waived jury trial on his insanity plea and was found by the court to have been sane at the time the crime was committed. As to each appellant the jury then fixed the penalty at death, and sentences were pronounced accordingly. As the following review of the testimony will show, the verdicts of the jury are supported by overwhelming evidence.

In September and October of 1959 the murder victim (Robert H. Ward, sometimes referred to in the evidence as "Bob") participated in a series of armed robberies with Ditson, Cisneros, Slaten, and Eugene and Norman Bridgeford,

---

[1] As hereinafter appears, Cisneros, at about this time, repudiated as false a written factual statement which Ditson presented to him for signature as their agreed joint statement, in the presence of their then joint attorney, which purported to exculpate Ditson by placing the guilt of the murder on one Leonard York.

Cisneros' first hesitant doubting of his mentor and ultimate recognition that Ditson had been his destroyer rather than benefactor become evident as the case unfolds.

who were brothers. The robberies were planned by Ditson, and each man had a specific duty. Ward failed to carry out his "assignment" of securely tying up the store owners in the last of these robberies. He effectively tied up the man but not the woman, and she released the man. The latter had a rifle readily available and started shooting. During the flight Eugene Bridgeford threw a stolen cash box into some shrubbery in an alley. On returning to the scene that night to retrieve the loot Cisneros and the Bridgefords were apprehended. (It will be noted that Ditson did not go on field work himself, but stayed at the store to maintain the front.)

Eugene Bridgeford and Cisneros were released on bail in mid-October. At the jewelry store approximately one week later Ditson told Bridgeford, in the presence of Cisneros, that Ward had been asking for money in return for silence as to Ditson's activities and that he had decided that "in some way Bob Ward would have to be eliminated, gotten rid of." Ditson had previously made it clear that "if at any time anybody ever got the idea that they could talk or squeal on the others, they would have to be eliminated in one way or another."

On November 6, 1959, Ditson told Bridgeford at the jewelry store that he had "decided that tonight would be the best night to get rid of Bob Ward," and that he was "through being blackmailed by a no-good-son-of-a-bitch like him." Ditson stated that he had given Ward $100 or more so far, and that "The only way is to get rid of him." Ditson outlined a plan that Cisneros should hit Ward on the head and "get" him, and that Bridgeford should accompany Cisneros to prevent Slaten (who lived with Ward) from interfering if he should try to protect Ward. Bridgeford agreed to go. Cisneros appeared from the back of the store, wrapping one end of a 2-pound, 14-inch jeweler's ring gauge with tape.

Bridgeford and Cisneros then drove in the latter's Cadillac to Ward's house, stopping on the way to buy two pints of liquor. Ward was a heavy drinker, and Cisneros bought the liquor to make him "more amiable." Cisneros parked the Cadillac in the street in front of the Ward-Slaten house, and the two men and Slaten (who apparently saw them arrive) entered the latter's Ford. Slaten sat behind the wheel, Bridgeford in the back seat behind Slaten, and Cisneros in the back seat on the passenger side. Slaten drove the Ford into the driveway and called out to Ward, who left the house and entered the car, sitting next to Slaten in the front seat. Cisneros said that he thought Ward was supposed to go back to Cleve-

land, but Ward replied "No. I have got a very good thing going here and I don't intend to quit now."

The four men spent approximately three-quarters of an hour drinking the two pints of liquor and discussing an imaginary robbery which Cisneros proposed to Ward. Cisneros had left the jeweler's ring gauge in his own automobile but he suddenly picked up a hammer from the floor of the Slaten Ford and struck Ward on the head. Ward fell over against Slaten, crying out, "Keith, help me. They are trying to kill me." Cisneros stood up and struck Ward repeated blows with the hammer, while the other two men struggled to get out of the car. In doing this Slaten appeared to push Ward up to where he would be a more convenient target for Cisneros' hammer blows. Slaten ran into the house but Cisneros told him to come back and said, "Just take it easy and it'll be all right." Ward crawled out of the car and leaned against a tree. Cisneros went up to him and struck him again with the hammer, knocking him down. Cisneros then backed the Cadillac into the driveway and, after striking several more blows, put Ward in the trunk of that car. Cisneros and Bridgeford drove off in the Cadillac, and Slaten left in the Ford.

After Cisneros had driven about half a mile in the Cadillac, Ward, who apparently had been unconscious for a time, began pleading with him to be released from the trunk and said that he thought one eye was out of its socket, but was told to be quiet. Cisneros turned the car radio on loud so that he could not hear Ward calling his name. A short time thereafter he misjudged a turn; the front wheel struck the curb and a tire blew out. He parked, and after looking for a telephone gave Bridgeford money to call Ditson and ask that he bring a spare tire and heavy commercial jack. Bridgeford did so, and about an hour later Ditson, accompanied by the above-mentioned Leonard York, arrived and the tire was changed. Cisneros, with Ward still in the trunk, took off at a high rate of speed and returned to the jewelry store. Bridgeford and York rode with Ditson to the store. Indistinguishable noises were emanating from the trunk of Cisneros' car, and Ditson said that Ward would have to be removed because the neighbors might hear him. Bridgeford, who in the meantime had taken York home,[2] excused himself, saying that he was sick.

---

[2] Except for what he was thereafter told, York's ride with Ditson was the meagre extent of his connection with the events of the evening; yet it was the peg by which Ditson sought (and asked Cisneros' help) to

Ditson took a .38 revolver from his store and left with Cisneros in the Cadillac. After driving some distance to a point in the country they stopped; Ditson opened the trunk, and ordered Ward to get out. Ward got out by himself, stood on his feet, and asked for a cigarette. Ditson shot him in the chest. He fell, got up, and ran toward Cisneros. They rolled over an embankment. Ward began to run and Ditson shot him in the back, paralyzing him. Ditson walked down the incline; Ward said, "Give me another one." Ditson knelt beside him, held the .38 against his head and finally killed him.

Cisneros, at Ditson's direction, dragged the body to the bottom of the embankment and started digging a grave, first with his hands and then with a butcher knife which Ditson brought from the car. They removed Ward's clothing and dismembered the body, cutting off the head and each arm at the elbow. Ditson explained that this was necessary to prevent identification. They buried the torso in the grave and threw the head and arms into the trunk of the car, and returned to the store.

Meanwhile, Slaten had driven to the house of his friend Martha Hughes (whose subsequent revelations to the F.B.I. and police contributed to breaking the case) and told her that he had been in a fight and wanted to clean up his car. Martha, according to her testimony, looked at him and at his car and said there was too much blood for a fight and Slaten replied, "Well, God damn. All right, so we killed him."[3] Martha continued, "He [Slaten] was shaking like a leaf. He had blood splattered all over him." After cleaning the car he and Martha drove to a market and she bought him some clean clothes. On the way back they stopped for coffee at a roadside stand and Slaten threw the hammer (which he told her he had to get rid of) into some bushes.

The next morning Ditson related to Bridgeford, in the presence of Cisneros, how they had killed Ward and dismembered and buried the body. Ditson also told York, and Cisneros later told Slaten.

Christine Longbrake, a witness for the People, testified that about two weeks before November 6, 1959, she was at

hang the murder guilt on him (see fn. 1, *ante*). The proposed story is evidenced by the above (and hereinafter) mentioned factual statement which Cisneros was asked to sign, and which contributed to his securing independent counsel.

[3]In justice to Slaten it is to be noted that the hammer blows he had witnessed did not kill Ward; however, he was later informed of the details of the killing.

Ditson's jewelry store, as was Carlos Cisneros. Ditson told her "there was someone they had to get rid of . . . the man was wanting some money out of him . . . [H]e asked me could he use my garage, and I said, 'Yes,' but I thought he was kidding . . . ." About two weeks later (shortly after the night of the murder) Ditson came to her house. Cisneros was with him. Ditson "asked if they could leave some boxes at my house . . . I said 'yes' . . . I seen two . . . ." They took them down into the cellar. Ditson had told Cisneros that she could not afford to refuse him. While in the cellar, Ditson knocked Ward's teeth out with a hammer. They then placed the remains in a hole that they had dug in the ground, and poured nitric acid over them before covering the hole. When Ditson and Cisneros returned from the cellar, "Well, being the conversation that was earlier in his store, I said, 'Is it somebody I know?' . . . I was smiling . . . I thought it was a joke. They were smiling and said I wouldn't know them . . . I said 'Are you serious?' or something to that effect, and he ["I think Mr. Ditson"] said 'Yes' . . . . [It] seems like I said 'Oh, you are kidding,' and Al said no, he wasn't kidding. After awhile I said, 'Now, you are kidding,' Carlos said 'No, he isn't kidding,' . . . I don't remember much else of the conversation after that." The two men then drove to Hansen Dam area and threw Ward's teeth and a dental plate into what they thought was a lake but later was discovered to be a gravel bed.

A "couple of days" after they had brought the boxes to the house, Cisneros returned and told Christine what had happened. He "went into the details of how he killed the man." The transcript repeats the whole story of the killing and the events of the evening and later, including "And they [the witness testified that Cisneros said "they"] put part of the man's body out on the desert and that what I had under my house was the head and arms, and after he told me this, he told me that he would never kill a woman, that he didn't really think that he could . . . . I said, 'Don't look at me.' " Later Mrs. Longbrake told Ditson that "I was going to move because I couldn't stand living in this house any longer and he told me that . . . he would move this if it bothered me so much . . . and that he would pay my rent if I would stay there any longer."

After Thanksgiving, Slaten, who had told Martha Hughes that he was afraid of Ditson because of what he (Slaten) knew, left for Oklahoma with a friend in the Ford. The car

broke down in Arizona; they abandoned it and hitch-hiked the rest of the way. Then Slaten voluntarily surrendered to the F.B.I. on robbery charges and was returned to California for trial. He was convicted and sentenced to state prison. In the meantime, Bridgeford had pleaded guilty to robbery charges and began serving time in San Quentin. There, at least for a time, they were relatively safe from Ditson.

Wynston Delmar Longbrake, a witness for the People, testified that in February of 1960, on his release from the Mira Loma Facility, Ditson told him "Just that Robert Ward had been killed, and when I asked the reason, he said, that . . . he was going to squeal on the gang." He testified that in a series of ensuing conversations both Ditson and Cisneros told him of the killing on the desert, of cutting off the arms and head, and that "after they were cut off there was acid poured over it and they were put in a box and put under the house we were living in at that time." He first learned of these events, however, "in November or December of 1959. My sister-in-law [Christine Longbrake] came up to see [me] while I was in Mira Loma and told me part of the story then."

In June 1960, Ditson asked George Longbrake, a 20-year-old brother-in-law of Christine, if he would dig up the two arms and head under the Longbrake house. George said he would do so, and some aluminum foil was procured to wrap up the remains. (Wynston Longbrake testified that Ditson gave him the money to buy the aluminum foil.) Ditson explained to George that he had had to "take care of somebody" and had "gotten rid of a guy." Ditson told him where to dig, but after digging for a while the next day George discontinued. He testified, "I started digging and got part of the way—the police car passed in front of the house and I got scared and went down to Allen Ditson's store . . . . Carlos Cisneros and Allen Ditson" were there. Carlos went back to the house with George and the head and arms were uncovered, wrapped in foil, placed in a box, and taken to the store.

Ditson later asked Wynston Longbrake if he wanted to go with him to "help bury something," and Wynston acquiesced. Accompanied by Wynston and Cisneros, Ditson then drove from Los Angeles on Highway 99 to a point in the Frenchman's Flat area (subsequently ascertained to be 14.2 miles beyond Castaic Junction) where he turned off the highway for about 100 yards. Cisneros stayed in the car while Ditson

and Wynston carried the foil-wrapped remains out of sight of the highway, dug a hole with a post-hole auger which Cisneros had procured, and buried them.

On June 6, 1960, Martha Hughes went to the F.B.I. and (as will be more fully described hereinafter) revealed in detail the story of the murder as it had been told to her by Ditson and Cisneros. On June 17 Slaten gave a similar statement to the police, and a statement was taken from Eugene Bridgeford on June 21. (All of these people testified at the trial; and all, as is obvious, were known to the police not only before Cisneros' confession but before his arrest.) On June 24 an examination of Cisneros' Cadillac revealed human blood stains in the trunk and on June 25 a similar examination of Slaten's Ford revealed traces of human blood on the upholstery. Ditson and Cisneros were taken into custody on June 28, 1960, "sometime after 1:00 p. m." Later that evening Cisneros led the police to the torso, and the next day Wynston Longbrake led the police to the head and arms. An autopsy established that the two sets of remains belonged to the same body, and that death was caused by a bullet wound in the head. The body was identified by fingerprints as being that of Robert Ward.

Cisneros' defense, in addition to the plea that he was insane when the acts were committed, was that he had no intention of killing Ward and took part in doing so only through fear of Ditson. He chose to testify at the trial and admitted describing the murder in detail to Slaten, Martha, Christine, the Bridgefords, and to other members of the gang. Ditson also chose to testify. He denied that he fired the shots which killed Ward or that he was present when the killing took place. He admitted that he participated in exhuming the head and arms under the Longbrake house and burying them in the desert, but asserted that he did so because of fear of what the gang members might do to his wife and children and the children of an employe. He produced an alibi witness and, as has been mentioned (fns. 1 and 2, *ante*), sought to implicate Leonard York as the head of the gang and the real killer.

As hereinabove indicated, both appealing defendants contend that the trial court erred in admitting certain evidence said to have been discovered *as a product* of an assertedly involuntary confession by Cisneros. The circumstances resulting in the confession are quite simple. Shortly after his arrest on June 28 Cisneros readily agreed to submit to a lie

detector test. He at first denied any knowledge of the crime; but under persistent, although in the circumstances seemingly reasonable, questioning admitted his guilt and some 10 or 20 minutes later made what is referred to as a further confession which the People sought to introduce into evidence. Objection was interposed on the ground that the confession was involuntary, and evidence directed to this issue was heard in the absence of the jury. The court sustained the objection and excluded both the lie detector test conversation and the subsequent confession.

Surprisingly, as on the record the holding seems at least questionable, the People do not challenge this ruling. It appears from the briefs and oral argument, however, that their failure to do so probably stems in part from their sharing the erroneous view of the trial court and in part from a belief that ''The ruling is one which, apparently, respondent may not contest.'' In this also the People are mistaken, as the point is one which in the event of a reversal '' '*might be involved on a retrial*' '' (*People* v. *Burke* (1956) 47 Cal.2d 45, 54 [9] [301 P.2d 241], quoting from *People* v. *Zelver* (1955) 135 Cal.App.2d 226, 236 [13] [287 P.2d 183]) and hence could have been raised here under section 1252 of the Penal Code.[4] (See also Code Civ. Proc., § 53.) As hereinabove indicated, for the purposes of this opinion to the extent that it may benefit defendants we shall assume—without deciding—that the subject confession was properly excluded as involuntary, although the evidence would appear to support a determination by us (see *People* v. *Trout* (1960) 54 Cal.2d 576, 583 [3] [6 Cal.Rptr. 759, 354 P.2d 231], and cases there cited) that neither the questioning of Cisneros by the polygraph officer nor any or all of the surrounding circumstances constituted coercion or overreaching or provided any ''motivating cause of the confession'' (see *People* v. *Brommel* (1961) 56 Cal.2d 629, 632 [1] [15 Cal.Rptr. 909, 364 P.2d 845]).[5]

---

[4]Section 1252 provides in relevant part that ''On an appeal by a defendant, the appellate court shall, in addition to the issues raised by the defendant, consider and pass upon all rulings of the trial court adverse to the State which it may be requested to pass upon by the Attorney General.''

[5]The probative facts relative to the making of the subject confession are uncontradicted. Many of the circumstances which in other cases have been held to constitute coercion were here absent. The time of arrest was shortly after 1 p. m. on June 28, 1960. This was after the police had interviewed the witnesses as hereinabove related and had knowledge of the essential facts (but not of all the evidential details) of the crime

■ The evidence quoted in footnote 5 speaks for itself. On its face, absent some other controlling factor, it appears to admit of only one reasonable inference; i.e., that any confession made in the depicted circumstances was free and voluntary. Other questions asked by the interrogating officer, and

---

and of the participation of Ditson and Cisneros therein. The defendants were taken to the East Los Angeles sheriff's station. While there, no one used any force or violence on Cisneros or threatened him or promised him anything. Detective Sergeant Collins ''asked him [Cisneros] if he would be willing to take a lie detector test, and he stated that he would.'' There is no dispute of this fact, nor is there evidence that Cisneros ever withdrew such consent. Thereupon he was taken to the Los Angeles Police Building and the subject lie detector test and conversation followed. Cisneros objected neither to the test as such nor to the questioning which it included. The whole test, including all questioning, was not protracted in duration: it lasted approximately two hours and twenty minutes. It took place at a reasonable time of day (the test began at about 6 or 7 p. m.); it was conducted by one officer rather than by a relay of officers, and no other persons were present at any time.

As the following excerpts will show, the transcript of the test and accompanying or ensuing conversation is replete with evidence to the effect (1) that the polygraph officer warned Cisneros that no promises of leniency could or would be made and (2) that, in any event, Cisneros had had prior experience in these matters which had convinced him that statements of the police seeming to be offers of leniency are in fact made only to obtain further information from the suspect and never result in the promised benefits:

''Q. [Officer Kearney] . . . How did it happen? Who pushed you into this thing, beside Ditson? Carlos? A. [Cisneros] I can't answer questions like that.

''Q. Well, why not? A. Well, I just can't—I won't.

''Q. What are you afraid of? A. I'm not afraid of anything, but they always hold it against you——

''Q. What—— A. ——Anything you answer.

''Q. Huh? A. Anything you answer, they always hold against you.

''Q. What do you mean, 'they hold it against you'? A. Well, I read a lot of cases, where that anything a man says is held against him. . . .

''A. Well, I mean, . . . this other time I got caught over here, I mean, the police they always tell you 'well, you tell us and we'll help you,' but, I mean that never happens, you know? . . . They just tell you and when they get the information, well, to hell with you, and I mean as far as I'm concerned, that's lower than I am because it has happened to me. It happened to the other fellow, I mean, they get your information and everything and they say, 'well, we'll take it easy on you' and all this, and they promise you this, and hell, a guy knows better, you know. . . .

''Q. . . . I'm not telling you I'm going to help you. I'm not promising you anything. I'm telling you, Carlos, help yourself. A. No, there's no way of helping myself. . . .

''Q. Don't you see what I'm trying to do for you? A. I know.

''Q. What? A. You're not trying to help me. You're just trying to get the information. It's going to end this puzzle for you, but I mean, as far as I'm concerned——

''Q. I want you to help yourself. I'm not promising you anything. A. No, I know that.

''Q. I'm not offering you anything. A. You can't.

''Q. Sure. A. I know that.

''Q. I wouldn't do it even if I could. . . .''

exhortations to tell the truth, serve to reveal further details of the conversation but do not eradicate the proof of defendant's knowledge of the significant facts he himself stated. Of course, if at any time the officer had used force or threats of force against defendant or those dear to him, or had offered reward of any kind, the situation would or could be materially changed. If there were conflicting evidence, or if the facts admitted of substantially conflicting inferences, the admissibility of the confession would depend on determining what was its motivating cause. (*People* v. *Brommel* (1961) *supra,* 56 Cal.2d 629, 632 [1].) But we find no suggestion of threats or promises. We do find searching questions and exhortations to help himself by revealing the acts of others. But absent something other than mere questions, or exhortations to tell the truth or clear his conscience or help himself by revealing facts as to the dominant part of Ditson or some other person in the criminal enterprise, there appears to be nothing on the face of the record which would support a finding of overreaching or coercion.

█ The mere fact that Officer Kearney questioned Cisneros and urged him to clear up the details of his own and Ditson's relative positions and activities in the gang murder of Ward does not in any way—in the undisputed circumstances—tend to show overreaching or coercion by the officer. We recognize, of course, that coercion can be psychological as well as physical. But in this we must exercise great care not to become confused: intellectual persuasion is not the equivalent of coercion. The essential elements of Cisneros' criminal activities were known to the officer. It was to Cisneros' advantage to bring out the truth that he had been led into participation in the gang crimes, and directed therein, by Ditson. From a respectable, reasonably well paid position he had been led grievously and depravedly astray by Ditson. That fact, aside from the tragic events of his childhood, was the only substantially appealing defensive matter brought out on his case in chief.

The asking of searching questions by Officer Kearney, coupled with his statements that he could not, and would not if he could, help Cisneros at the bar of justice, but that he was trying to get Cisneros to help himself by clearing up the details as to Ditson's dominant control, appears to have been a straightforward, honest procedure.

█ Mr. Justice Traynor in his concurring opinion in *People* v. *Garner* (1961) *ante,* pp. 156, 161-164 [18 Cal.

Rptr. 40, 367 P.2d 680], ably enunciates the principles which should guide courts of all jurisdictions in resolving troublesome questions of the character of that at hand : "Although questioning may sometimes be an easy substitute for scientific police work, it is also often essential to the solution of a crime and the conviction of the guilty. There may be no witnesses other than the accused, or the witnesses may be dead or unavailable. Thus, as Justice Frankfurter stated in *Culombe* v. *Connecticut*, 367 U.S. 568 [81 S.Ct. 1860, 6 L.Ed.2d 1037] : 'Despite modern advances in the technology of crime detection, offenses frequently occur about which things cannot be made to speak. And where there cannot be found innocent human witnesses to such offenses, nothing remains—if police investigation is not to be balked before it has fairly begun— but to seek out possibly guilty witnesses and ask them questions, witnesses, that is, who are suspected of knowing something about the offense precisely because they are suspected of implication in it.

" 'The questions which these suspected witnesses are asked may serve to clear them. They may serve, directly or indirectly, to lead the police to other suspects than the persons questioned. Or they may become the means by which the persons questioned are themselves made to furnish proofs which will eventually send them to prison or death.' (*Id.* at p. 1040·[6 L.Ed.2d] ; see *Watts* v. *Indiana*, 338 U.S. 49, 57-62 [69 S.Ct. 1347, 93 L.Ed. 1801] (concurring opinion).) . . .

"The perpetrator of a crime is normally the one who knows most about it, and his confession, voluntarily made, is often the best evidence of his guilt that can be obtained. (See *Commonwealth* v. *Dillon*, 4 Dall. (U.S.) 116, 117 [1 L.Ed. 765] ; *Commonwealth* v. *Agoston*, 364 Pa. 464 [72 A.2d 575, 583] ; *People* v. *Valletutti*, 297 N.Y. 226 [78 N.E.2d 485, 488] ; *Haley* v. *Ohio*, 332 U.S. 596, 614 [68 S.Ct. 302, 92 L.Ed. 224] [dissenting opinion].) Only overwhelming social policies can justify the exclusion of such vital evidence. In the case of coerced confessions, the evidence may be unreliable; even if reliable, a free society cannot condone police methods that outrage the rights and dignity of a person whether they include physical brutality or psychological coercion. (See *Spano* v. *New York*, 360 U.S. 315, 320-321 [79 S.Ct. 1202, 3 L.Ed.2d 1265] ; Maguire, Evidence of Guilt 109.) When a confession is voluntary, however, courts are reluctant to exclude it. 'Interrogation *per se* is not, while violence *per se* is, an outlaw.' (*Ashcraft* v. *Tennessee*, 322 U.S.

143, 160 [64 S.Ct. 921, 88 L.Ed. 1192] [dissenting opinion]; see *Lyons* v. *Oklahoma*, 322 U.S. 596, 601 [64 S.Ct. 1208, 88 L.Ed. 1481]; *Lisenba* v. *California*, 314 U.S. 219, 239-241 [62 S.Ct. 280, 86 L.Ed. 166].)

██ "As many commentators and courts have recognized, there is a 'compulsion to confess' to crime. Wigmore states the point colorfully: 'The nervous pressure of guilt is enormous; the load of the deed done is heavy; the fear of detection fills the consciousness; and when detection comes, the pressure is relieved; and the deep sense of relief makes confession a satisfaction. At that moment, he will tell all, and tell it truly. To forbid soliciting him, to seek to prevent this relief, is to fly in the face of human nature.' (Wigmore on Evidence, 3d ed. § 851 at p. 319; see e.g., *Commonwealth* v. *Agoston*, 364 Pa. 464 [72 A.2d 575, 581, 583].) A psychiatrist explains the phenomenon of confessions in terms of subconscious but overpowering guilt feelings and desire for punishment. 'There is . . . an impulse growing more and more intense suddenly to cry out his secret in the street before all people, or in milder cases, to confide it at least to one person, to free himself from the terrible burden. The work of confession is thus that emotional process in which the social and psychological significance of the crime becomes preconscious and in which all powers that resist the compulsion to confess are conquered.' (Reik, The Compulsion to Confess, p. 267.)

"So long as the methods used comply with due process standards, it is in the public interest for the police to encourage confessions and admissions during interrogation."

The merit of the principles depicted in the quotation from Justice Traynor's opinion is demonstrated here by the fact that the record before us contains the following statement in writing made by Cisneros, after conviction, to the trial judge: "I admitted what I did because I couldn't live with myself any more. I had terrible nightmares, going through what had happend [*sic*] that night over and over. I considerd [*sic*] myself a monster, even dog's [*sic*] would run away from me where they never did before. . . . I was afraid to play with my kids because I thought I might go craze [*sic*] and hurt them.

"The way I feel about getting caught, is like a Blessing [*sic*] from heaven.

"Even though I find myself fighting fore [*sic*] my life, I feel clean and have a wonderful feeling inside.

". . . Getting all that out of my system is enough to make any body [*sic*] happy and that's the way I feel."

Thus, regardless of how it appeared to the trial court at the time the confession was offered in evidence, its true motivating cause is now revealed. Nevertheless, insofar as it may benefit defendants we shall continue assuming that the confession was properly excluded.

As stated at the outset, the trial court's expressed understanding of the law relating to the admissibility of the product or "fruits" of an involuntary confession has been rejected by the Supreme Court of the United States and must be regarded as untenable. We therefore undertake to state the now-established rule under federal decisions, which rule has been recognized, although perhaps not heretofore unqualifiedly adopted, as the rule governing such procedure in California. Because some earlier California cases followed the older rule it is appropriate to give some history of the modern rule's evolution.

At common law involuntary confessions were excluded on the ground of their presumed untrustworthiness, i.e., "not because any wrong is done to the accused, in using them, but because he may be induced, by the pressure of hope or fear, to admit facts unfavorable to him, without regard to their truth, in order to obtain the promised relief or avoid the threatened danger" (*Commonwealth* v. *Morey* (Mass., 1854) 1 Gray 461, 462-463; accord: *Pennsylvania* v. *Dillon* (Pa., 1792) 4 Dall. 115, 117 [1 L.Ed. 765]; *State* v. *Vaigneur* (S.C., 1852) 5 Rich. 391, 400; 3 Wigmore, Evidence (3d ed. 1940) § 822, and cases there cited). As a corollary to this rule evidence of physical facts discovered by means of an involuntary confession was uniformly held to be admissible since it tended to "corroborate" or prove the trustworthiness of the confession (*United States* v. *Hunter* (C.C.D.C. 1806) 26 F.Cas. 436 (No. 15, 424); *Gates* v. *People* (1853) 14 Ill. (4 Peck.) 433, 437; *Commonwealth* v. *Knapp* (Mass., 1830) 9 Pick. 495, 511 [20 Am.Dec. 491]; *Garrard* v. *State* (1874) 50 Miss. 147, 151; *Duffy* v. *People* (1863) 26 N.Y. 588, 590; 2 Wharton, Criminal Evidence (12th ed. 1955) § 358; 3 Wigmore, *supra*, § 859; Note, 53 L.R.A. 402). As indicated hereinabove, three early decisions of this court espoused the view that such evidence was admissible (*People* v. *Ah Ki* (1862) 20 Cal. 177, 179; *People* v. *Hoy Yen* (1867) 34 Cal. 176, 177; *People* v. *Murphy* (1873) 47 Cal. 103, 105), and a dictum to

the same effect appears in a 1924 opinion (*People* v. *Castello* (1924) 194 Cal. 595, 601 [4] [229 P. 855]).

In the years which have elapsed since that date, however, the views of the courts on the nature and scope of the constitutional guarantee of due process of law have evolved a concept that bears directly on this problem. Beginning with *Brown* v. *Mississippi* (1936) 297 U.S. 278 [56 S.Ct. 461, 80 L.Ed. 682], the United States Supreme Court has set aside a number of state convictions on the ground that the Due Process Clause of the Fourteenth Amendment "is grievously breached when an involuntary confession is obtained by state officers and introduced into evidence in a criminal prosecution which culminates in a conviction" (*Blackburn* v. *Alabama* (1960) 361 U.S. 199, 205 [80 S.Ct. 274, 4 L.Ed.2d 242]).[6] The earlier decisions in this series invoked the traditional view that an involuntary confession was inadmissible because untrustworthy (see *Lisenba* v. *California* (1941) 314 U.S. 219, 236-237 [62 S.Ct. 280, 86 L.Ed. 166]), and held that the admission of such a confession denied the defendant due process of law by preventing him from having a fair trial. In *Haley* v. *Ohio* (1948) 332 U.S. 596 [68 S.Ct. 302, 92 L.Ed. 224], a new rationale made its first (insofar as our research discloses) explicit appearance: Due process is denied whenever a confession is used which has been obtained "by means which the law should not sanction" (*id.* at p. 601; see concurring opinion of Frankfurter, J., in *Malinski* v. *New York* (1945) 324 U.S. 401, 416-418 [65 S.Ct. 781, 89 L.Ed. 1029]; *cf. Ashcraft* v. *Tennessee* (1944) 322 U.S. 143, 154 [64 S.Ct. 921, 88 L.Ed. 1192]). No consideration was given in the majority opinion in *Haley* to the issue of whether or not the confession was trustworthy; rather, reversal flowed from the "inquisitorial practices" of the police (*id.* at p. 601) in wringing a confession from the defendant, the high court stating that "We do not think the methods used in obtaining this confession can be squared with that due process of law which the Fourteenth Amendment commands" (*id.* at p. 599). Following *Haley*, the view that constitutionally impermissible methods of obtaining a confession will vitiate criminal proceedings in which the confession is introduced was restated and expanded in *Watts* v. *Indiana* (1949) 338 U.S. 49, 54-55 [69 S.Ct. 1347, 1357, 93 L.Ed. 1801], *Rochin* v. *California* (1952) 342 U.S.

---

[6] A list of the cases reviewed (not all of which resulted in reversals) to the end of the 1958 term appears in *Spano* v. *New York* (1959) 360 U.S. 315, 321, fn. 2 [79 S.Ct. 1202, 3 L.Ed.2d 1265].

165, 172-174 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396], and *Blackburn* v. *Alabama* (1960), *supra*, 361 U.S. 199, 206-207.[7]

More recently yet, in *Rogers* v. *Richmond* (1961) 365 U.S. 534, 543-544 [81 S.Ct. 735, 5 L.Ed.2d 760], the United States Supreme Court went so far as to declare that the traditional "trustworthiness" test of admissibility "is not a permissible standard under the Due Process Clause of the Fourteenth Amendment." In holding that the Connecticut state courts erred in employing a standard "infected by the inclusion of references to probable reliability" (*ibid.*) to determine the admissibility of the defendant's confession, the high court stated that "Our decisions under [the Fourteenth] . . . Amendment have made clear that convictions following the admission into evidence of confessions which are involuntary, i.e., the product of coercion, either physical or psychological, cannot stand. This is so not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth. [Citations.] To be sure, confessions cruelly extorted may be and have been, to an unascertained extent, found to be untrustworthy. But the constitutional principle of excluding confessions that are not voluntary does not rest on this consideration." (*Id.* at pp. 540-541.) In this respect the *Rogers* decision may be viewed as unanimous.[8]

A parallel development has taken place in the decisions of this court. In *People* v. *Cahan* (1955) 44 Cal.2d 434, 441-442 [282 P.2d 905, 50 A.L.R.2d 513], unnumbered footnote, we observed that "It is now settled that such [i.e., involuntary] confessions are excluded, not because they may lack evidential trustworthiness [citations], but because of the man-

---

[7]*Stein* v. *New York* (1953) 346 U.S. 156, 192 [73 S.Ct. 1077, 97 L.Ed. 634], appears to represent a regression in this development, but the merit or demerits of that decision need not concern us here (see Notes, 41 Cal.L.Rev. 672 (1953); 39 Corn.L.Q. 321 (1954); 67 Harv.L.Rev. 118 (1953); 52 Mich.L.Rev. 421 (1954)).

[8]While disagreeing with the procedural disposition of the case, the dissenting justices (Stewart, J., and Clark, J.) nevertheless agreed that the Connecticut courts had failed "properly to verbalize the correct Fourteenth Amendment test of admissibility" in considering in their determination "the impermissible factor of probable reliability" (*id.* at pp. 549, 550).

ner in which they are obtained." ■ That this conclusion is impelled by the due process clause of our own Constitution (Cal. Const., art. I, § 13) as well as that of the Fourteenth Amendment, was affirmed in *People* v. *Berve* (1958) 51 Cal.2d 286, 290 [1] [332 P.2d 97], where we stated that the use of involuntary confessions in a criminal prosecution "constitutes a denial of due process of law both under the federal and state Constitutions requiring a reversal of the conviction although other evidence may be consistent with guilt."

■ And while we may have continued to make occasional reference to the "trustworthiness" rationale (and surely this is of importance, by any standard) (see *People* v. *Atchley* (1959) 53 Cal.2d 160, 170 [5] [346 P.2d 764], *cert. dismissed* (1961) 366 U.S. 207 [81 S.Ct. 1051, 6 L.Ed.2d 233] it appears, in the light of the above-cited decisions, that involuntary confessions will in proper circumstances be excluded by this court "because it offends 'the community's sense of fair play and decency' to convict a defendant by evidence extorted from him, and because exclusion serves to discourage the use of physical brutality and other undue pressures in questioning those suspected of crime." (*Ibid.*)

■ It appears to us to follow that if it offends "the community's sense of fair play and decency" to convict a defendant by evidence extorted from him in the form of an involuntary confession, that sense of fair play and decency is no less offended when a defendant is convicted by real evidence which the police have discovered *essentially by virtue of having extorted such a confession*. If the one amounts to a denial of a fair trial and due process of law, so must the other. If the one is the inadmissible product of "police procedure which violates the basic notions of our accusatorial mode of prosecuting crime" (*Watts* v. *Indiana* (1949), *supra,* 338 U.S. 49, 55), so must the other be. It does not appear that we can draw a constitutionally valid distinction between the two. (We are not here suggesting, however, that the record before us contains a showing that *any* confession was obtained by means which offend "the community's sense of fair play and decency.")

■ It follows also that the reason for the common-law rule permitting the introduction of *real evidence* discovered by means of an involuntary confession—that such evidence tends to prove the "trustworthiness" of the confession—must now be deemed constitutionally indefensible, and hence that the rule itself must be abandoned. The inquiry should instead be

directed to the issue of whether the introduction of the challenged evidence—the confession itself or its asserted product —in a criminal prosecution which culminated in a conviction denied the defendant, in the particular circumstances of that case, any essential element of a fair trial or due process of law. To the extent that a contrary rule is announced or applied in *People* v. *Ah Ki* (1862), *supra*, 20 Cal. 177, *People* v. *Hoy Yen* (1867), *supra*, 34 Cal. 176, *People* v. *Murphy* (1873), *supra*, 47 Cal. 103, and *People* v. *Castello* (1924), *supra*, 194 Cal. 595, such decisions are overruled. It is our duty to protect the defendant as to these fundamental rights in full measure as against the power of the state. It is likewise equally our duty not to unnecessarily hamper the state in its properly diligent efforts to enforce the law for the protection of all persons within our jurisdiction.

 The conclusion we reach today was foreshadowed in our decision in *People* v. *Matlock* (1959) 51 Cal.2d 682, 697 [21]-698 [22] [336 P.2d 505]. In that case an interrogating officer threatened to "bring the rest of the [defendant's] family in" unless the defendant told the police where he had hidden jewelry involved in the robbery-murder of which he was subsequently convicted. The defendant led them to the jewelry, and made certain self-incriminatory statements as to how it had come into his possession. In discussing the admissibility of such evidence we said: "Nor are we impressed by holdings that evidence of physical facts discovered by aid of a coerced confession, and so much of the confession as relates to the discovery of those facts, are admissible because the physical facts preclude the possibility of the confession being false. (*People* v. *Castello* (1924) 194 Cal. 595, 601 [4] [229 P. 855]; *People* v. *Murphy* (1873) 47 Cal. 103, 105; *People* v. *Hoy Yen* (1867) 34 Cal. 176, 177; *People* v. *Ah Ki* (1862) 20 Cal. 177, 179.) Real evidence may be discovered in circumstances which show defendant's guilt without any substantial question whatsoever, yet convictions obtained by such evidence may be stricken down because of the requirements of due process or of court-made rules of evidence based upon the court's refusal to condone, and thereby in effect encourage, official flouting of the law. (*Rochin* v. *California* (1952) 342 U.S. 165, 172 [72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396]; see also opinions of the District Court of Appeal, and opinions of dissenting justices on denial of hearing in California Supreme Court, in *People* v. *Rochin* (1950) 101 Cal.App. 2d 140 [225 P.2d 1, 913]; *Anderson* v. *United States* (1943)

318 U.S. 350 [63 S.Ct. 599, 87 L.Ed. 829], reversing *Anderson* v. *United States* (1941) 124 F.2d 58, 66 [13, 15]; *People* v. *Cahan* (1955) 44 Cal.2d 434, 445-449 [282 P.2d 905].) In the whole circumstances of this case, however, we conclude that on the present record neither the threat alone nor its combination with the other circumstances in which defendant gave his statements was as a matter of law so inherently coercive as to require that we reject the officers' testimony that the statements were freely made, or that we now hold that the jewelry discovered as a result of the threat must be inadmissible upon a new trial.''

In the case at bench defendants specifically argue that, having excluded Cisneros' confession, the court should also have excluded (1) the testimony of Officer Lawton describing the finding of the *torso*, and the photographs taken at the scene; and (2) the testimony of Wynston Longbrake and Officer Murphy describing the finding of the *head and arms*, and the photographs of that scene. Defendants contend that such testimony and exhibits were the ''fruits'' of the confession which had been excluded as involuntary, and hence that their admission into evidence deprived the defendants of a fair trial and due process of law.

The contention cannot be sustained, as the facts before us on each of two independently adequate bases render the rule inapplicable. To begin with, the *torso* described in Officer Lawton's testimony was admittedly unidentifiable, and hence furnished neither essential nor even, in the circumstances, substantial proof of the corpus delicti of the murder of Robert Ward. Standing alone, this testimony and the related photographs proved nothing more than the veracity of Cisneros.

In the next place, and more affirmatively to the point of establishing the first of the two independently adequate bases,[9] we point out that the corpus delicti was fully and overwhelmingly established by the testimony and photographs of the recovery of the *head and arms* and that (assuming for the moment such evidence to be a product of the confession) defendants are precluded from complaining of the admission of such evidence by their failure to have made timely objection thereto upon the trial. Defendants without objection permitted the People's witnesses Wynston Longbrake and Officer Murphy to be examined and testify to the manner and place of recovery of the head and arms. Nor was objection

---

[9]The second of the two bases follows in appropriate sequence.

made to the testimony of the autopsy surgeon, Dr. Harold
Kade, who demonstrated that the two sets of remains belonged
to the same body and that death was caused by a bullet wound
in the head, or to the testimony of the fingerprint expert,
Officer McLaughlin, who identified the body as being that of
Robert Ward. Although the confession had not as such been
offered in evidence at that time, defendants were fully aware
of its contents and the circumstances in which it was made.
Counsel for Cisneros had obtained a pretrial order for inspec-
tion of the statements made by the latter during and after
the lie detector test, and had prepared and filed a memoran-
dum and offer of proof containing copious extracts from the
transcript of such statements and attacking the voluntariness
of the confession. If defendants intended to claim that the
confession was involuntary and that the recovery of the *head
and arms* was an inadmissible "fruit" of the confession it
was their clear duty to state the objection and its grounds so
that, if necessary, a further foundation could be laid and
the matter argued. Whether the discovery of the head and
arms was a product of the confession presents a question of
fact entirely separate and distinct from any issue as to admis-
sibility of the confession. Defendants failed to so object, and
also failed to move to strike any of the above mentioned testi-
mony when the confession was subsequently offered by the
People.[10]

As the second ground independently requiring re-
jection of defendants' subject contention, we point out that
the testimony of Wynston Longbrake (and, consequently, of
Murphy, Kade, and McLaughlin) was not in any event a
product or "fruit" of the excluded confession. The meagre
content of the information given by Cisneros to Officer
Kearney in this connection is set forth in its entirety in the
footnote.[11] In his subsequent statement to Officers Gotch and

---

[10] At the close of the People's case defendants did object to the ad-
mission of a large number of exhibits offered by the prosecution, includ-
ing the photographs of the recovery of the head and arms. The objection,
however, was tardy and was not directed to the *testimony* of witnesses
Longbrake, Murphy, Kade, or McLaughlin. It therefore was insufficient
to preserve a claim of error with respect to such testimony. The photo-
graphs, which were admitted over the objection, were merely illustrative
of various aspects of that testimony.

[11] "Q. [Officer Kearney] Then what did you do after you cut him up?
What did you do with his head, and the arms? A. [Cisneros] I don't
know where those are.

"Q. Well, what did you do with the head, Carlos? A. That part I
don't know.

"Q. What do you mean, 'that part you don't know'? You put them

Collins Cisneros named himself ''and Al [Ditson] and Shorty'' as the participants in the reburial of the head and arms, and the officers correctly understood ''Shorty'' to refer to Gerald Longbrake's brother, Wynston. The dangers inherent in a careless application of the above-enunciated rule—which now must be recognized by police, prosecutors and courts as controlling in California—are well illustrated by defendants' contention that the naming of Gerald and Wynston Longbrake by Cisneros was ''evidence'' obtained as a result of an involuntary confession, and that all of Wynston Longbrake's testimony was therefore rendered inadmissible. It is not difficult to conceive of a situation where an experienced criminal suspect, becoming convinced that the police have ''got the goods'' on him, allows his interrogators to go so far as to say the possibly magic words, ''it would be better for you if you told what you knew'' (see *People* v. *Brommel* (1961), *supra*, 56 Cal.2d 629, 632 [1]), and then proceeds to name in his ensuing ''confession'' every person with knowledge of the essential facts of the crime in the hope of thereby securing immunity for himself and all of his coconspirators or accessories on ''due process'' grounds. It is for this reason that the trial judge (or the jury, if the matter is submitted to them) must exercise great care to determine (1) that the alleged promise or threat was *in fact* an essential ''motivating cause of the confession'' (*ibid.*) and (2) that the asserted ''fruits''

---

in a can; carried it around in your car for a few days, right? A. No.

''Q. Well, then, what did you do with them? A. They were buried.

''Q. They were buried? A. Yap.

''Q. Where? A. Up at this fellow's house.

''Q. Whose fellow's house, Ditson's? A. No.

''Q. Milano? A. No.

''Q. Slaten? Up at whose fellow's house? A. Longbrakes.

''Q. Which one? Which one of the Longbrakes? A. Be Jerry [*Gerald, husband of Christine*].

''Q. Jerry? Where's his house? A. Up in Sunland.

''Q. Up in Sunland? Is that the one near the gravel pit? A. I don't know no gravel pit.

''Q. What street is that on, do you remember that? A. I don't know. I don't recall the name of it.

''Q. But you could help the officers find it, couldn't you? A. It's not there any more.

''Q. Why not? A. He moved again.

''Q. His house was moved? A. No, the stuff.

''Q. Where was it moved to? A. That part I couldn't answer 'cause I wasn't the one that moved it.

''Q. Who moved it, Ditson? He buried it in back of his store, right? A. No. No, not like that.

''Q. But you know where it is? A. No, I don't know where it is.

''Q. What did he do with his head? Was that with the arms? A. I guess it is.''

of the confession thus found to be involuntary were *in fact* a product of that confession and would not have been otherwise discovered by the police from information already in their possession or independently acquired.

Here the record demonstrates that the naming of Gerald and Wynston Longbrake was not evidence but merely a ''lead'' in a process of investigation which had begun before defendants' arrest and had furnished the prosecution with all the evidence necessary to convict defendants of the murder of Robert Ward. Martha Hughes testified that in early December of 1959 she went to Ditson's jewelry store and told Ditson and Cisneros that the F.B.I. were coming to her house and that she did not know what to say. Ditson told her to keep quiet and say nothing. On leaving the store she was accosted by Cisneros who said to her, ''We know that you know,'' and told her in detail how they had killed Ward and dismembered the body. (F.B.I. agents interviewed Martha later that day and at that time she revealed nothing.) Their confessions to her apparently were made not in a spirit of repentance but rather by way of boasting and to intimate as a semi-veiled but obvious warning that what had been done to Ward might happen to her if she should reveal her knowledge to inquiring officers. The defendants, before they briefed her on all the details, knew that she was already aware that Ward had been killed. Before he fled to Oklahoma Slaten had told her of his own involvement and she had seen his blood-drenched car, had procured clean clothing for him, and had been with him when he disposed of the hammer with which Ward had been attacked. On June 6, 1960, she went to the F.B.I. and related in detail the story of the assault and murder as she knew it and as it had been told to her, naming the time and place of each event and all the participants. While she did not know the exact location of the remains she was able to tell the officers that the torso was buried in the desert, that the head and arms had been buried under a house but were subsequently dug up, and that the teeth and dental plate had been thrown into a lake (later, apparently, found to be on land near the lake) in the Hansen Dam area. This information was transmitted to Headquarters Detective Bureau of the Los Angeles Police Department on June 13. On June 17, at Chino, a statement was taken from Slaten in which he described in detail the assault on Ward in his car and recounted the killing in the desert as it had been told to him by Ditson and Cisneros. On June 21, at San Quentin, a

substantially similar statement was taken from Eugene Bridgeford. As noted hereinabove, defendants were arrested on June 28.

It therefore appears either directly or by fair inference that every essential detail of the crime was known to the law enforcement officers before defendants were arrested and Cisneros made the subject confession. The officers knew that Robert Ward had been killed on the night of November 6, 1959. They knew how and where and by whom he had been killed.[12] That the police may not have known at that time that Winston Longbrake in particular could lead them to the then resting place of the remains does not support defendants' contention, for the questions asked of Cisneros by the officers indicate that the police already knew of the various members of the Longbrake family (some of whom had recently served time in prison) and of their possible connection with the crime. The challenged evidence, therefore, was not a product or ''fruit'' of the confession and its admission did not deprive defendants of a fair trial or due process of law.

Furthermore, in connection with the sources and sufficiency of the evidence establishing the corpus delicti, it is noted that defendants Ditson, Cisneros, and Slaten took the stand and testified to all the incidents of the crime: the first assault with the hammer (Cisneros, Slaten), the killing in the desert (Cisneros), and the burial and reburial of the remains (Cisneros, Ditson). Their testimony *in court* is not to be regarded either as extrajudicial admissions or as confessions—it is direct evidence competent for the proof of all elements of the crime. The election of these defendants to testify was not a product of the excluded confession, and their testimony supplied everything that evidence of the physical remains could supply. It is, of course, elementary and unquestioned that a defendant who chooses to *testify* is just as competent to establish the corpus delicti as any other

[12]In this connection it is noted that the deputy district attorney told Slaten, on the day of defendants' arrest but prior to Cisneros' confession, that the People were prepared to prosecute Ditson and Cisneros for the murder of Ward without physical evidence of the body and that ''it would be something like the L. Ewing Scott prosecution.'' Scott, it will be remembered, was convicted of the murder of his wife on wholly circumstantial evidence (*People* v. *Scott*, (1959) 176 Cal.App.2d 458 [1 Cal.Rptr. 600], *appeal dismissed* (1960) 364 U.S. 471 [81 S.Ct. 245, 5 L.Ed.2d 222]). The case against Ditson and Cisneros, of course, was largely grounded on the *direct* evidence furnished by the testimonies of the various witnesses, including defendants themselves.

witness. (See e.g., *People* v. *Kelly* (1925) 70 Cal.App. 519, 523 [3] [234 P. 110]; *People* v. *Kinsley* (1931) 118 Cal.App. 593, 602 [11] [5 P.2d 938]; *People* v. *Hudson* (1934) 139 Cal.App. 543, 544-545 [2] [34 P.2d 741]; *People* v. *Hill* (1934) 2 Cal.App.2d 141, 155 [9] [37 P.2d 849]; *People* v. *Kaye* (1941) 43 Cal.App.2d 802, 810 [2] [111 P.2d 679]; *People* v. *King* (1955) 132 Cal.App.2d 642, 647-648 [282 P.2d 923]; *People* v. *Lawrence* (1956) 141 Cal.App.2d 630, 633 [3] [297 P.2d 144]; *cf. People* v. *Ives* (1941) 17 Cal.2d 459, 464 [2-4] [110 P.2d 408].)

The remaining contentions of each defendant may be disposed of more briefly. Ditson complains of the admission into evidence of two colored photographs of Ward's tattooed forearms. He argues that such photographs were not a fair representation of the subject as it appeared at a time when its appearance was relevant; that there was no evidence that Ward had tattoos on his forearms; that the photographs had no probative value, either as identification or as showing the cause of death, and hence that they were put into evidence for the sole purpose of inflaming the emotions of the jurors. The argument is without merit. The photographs in question were not offered to prove the victim's identity or the cause of his death, but to show a motive for defendants' severing the arms at the elbows rather than at the wrists: i.e., to forestall an identification of the body by means of the tattoos there depicted. The tattoo marks are quite visible in the photographs, and there seems to have been no such change in the appearance of the forearms as would render the photographs inadmissible for that reason. The autopsy surgeon (Dr. Harold Kade) identified the contents of the photographs, and testified that they truly reflected any tattoo marks that were on Ward's forearms. The trial court could properly conclude in the exercise of its discretion that the probative value of the subject photographs outweighed any prejudicial effect they might have on the jury. (*People* v. *Kemp* (1961) 55 Cal. 2d 458, 478 [18] [11 Cal.Rptr. 361, 359 P.2d 913], and cases there cited.)

 Ditson next contends that the trial court erred in allowing Cisneros to testify, over an objection on the ground of privileged communications, to statements which Ditson made to him after their arrest in the presence of W. M. Brooks, their then joint attorney. As hereinabove mentioned, Brooks represented both defendants in the early stages of the proceedings (and had represented Cisneros and the Bridgeford brothers in a previous robbery prosecution), but was

relieved as counsel for Cisneros on September 19, 1960, at the latter's request. Prior to that time several interviews were held between Brooks, Ditson, and Cisneros in the attorney room of the county jail. Cisneros testified that during these interviews Ditson asked him to implicate Leonard York and exonerate him (Ditson) by falsely testifying that York killed Ward, and then told him to sign a statement to this effect (see *ante*, fns. 1 and 2) produced by Brooks, and that he did so because he was afraid of Ditson.

Ditson contends that any statements allegedly made by him in Brooks' presence were privileged as against strangers (including the People), and that Cisneros could not waive Ditson's privilege in this regard. The contention is unsound. Brooks was not called as a witness; and Cisneros, who waived the privilege as to himself, was not allowed to testify to any conversation between Brooks and Ditson. The testimony was offered and admitted for the limited purpose of establishing Cisneros' defense that he acted under the domination and control of another, and the jury were specifically instructed at that time that it was not to be considered against any of the other defendants. There was no violation of the attorney-client privilege (Code Civ. Proc., § 1881, subd. 2).

Ditson's final contention is that instructions on conspiracy should not have been given because the crime of conspiracy was not charged in the indictment. The point is devoid of merit. There was ample evidence from which the jury could reasonably have inferred the existence of a conspiracy among these defendants to murder Robert Ward, and instructions on the subject were therefore warranted as defining a factual basis upon which, if proven, the acts and declarations of the several coconspirators would be competent evidence against all. (*People* v. *Davis* (1957) 48 Cal.2d 241, 250 [11] [309 P.2d 1]; *People* v. *Weiss* (1958) 50 Cal.2d 535, 565 [21]-566 [22] [327 P.2d 527].)

Cisneros contends that it was prejudicial error to allow three court-appointed alienists to testify, during the trial of the not guilty plea, to statements amounting to admissions and confessions which he assertedly made to them in the course of the psychiatric examination provided for by statute under a plea of not guilty by reason of insanity (Pen. Code, § 1027). He argues that if the alienists may be required to reveal on the guilt phase of the trial incriminating statements of fact made by a defendant during such an examina-

tion, the defendant will find himself in an insoluble dilemma: if he talks, his statements may be used to establish his guilt; if he refuses to talk, (1) the alienists will probably be unable to form an opinion as to his true mental condition and (2) his silence may be commented upon as evidence of consciousness of guilt. Such a result, Cisneros argues, amounts to a violation of his constitutional privilege against self-incrimination and thus deprives him of due process of law.

The argument is untenable. "Merely because the statute [Pen. Code, § 1027] provides that it is the *affirmative* duty of an alienist to testify whenever summoned in a sanity proceeding does not mean or even imply that he is *prohibited* from testifying in other proceedings where information that he may have is relevant and material." (*People* v. *Combes* (1961) 56 Cal.2d 135, 149 [17] [14 Cal.Rptr. 4, 363 P.2d 4].) Here each of the alienists had questioned Cisneros as to his memory of the events of the night of the crime, such information being necessary to a proper psychiatric determination of whether he had suffered an epileptic seizure on that night preventing him from having the required specific intent to commit first degree murder. Their testimony in this connection was both relevant and material, and hence was admissible on the guilt phase of the trial (see *People* v. *Wells* (1949) 33 Cal.2d 330, 351 [14b] [202 P.2d 53]) whether as part of the People's case in chief (Dr. Smith) or to rebut conflicting medical testimony introduced by the defense (Drs. Dwankowski and Thompson). Cisneros was not compelled to submit to the psychiatric examination; he did so voluntarily. His contention that this resulted in a violation of his privilege against self-incrimination is without merit, and has recently been rejected by this court (*People* v. *Combes* (1961), *supra*, 56 Cal.2d 135, 149-150 [20]; *accord*: cases collected in note, 32 A.L.R.2d 434, 444-448). There is, of course, no doctor-patient privilege in criminal cases (Code Civ. Proc., § 1881, subd. 4), although at the trial Cisneros appeared to object to the alienists' testimony on that ground as well.

 Cisneros next contends that the trial court erred in refusing to allow a lay witness (Mrs. Razo, Cisneros' aunt) to give her opinion as to his mental condition, short of insanity, at certain times prior to the commission of the crime. He argues that the witness' opinion, based on her own observations of his conduct and expressed in her own language, was relevant to the issue of specific intent and hence was admissible (citing *People* v. *Webb* (1956) 143 Cal.App.2d

402, 410 [300 P.2d 130]). Any error committed by the trial court in this respect, however, must be deemed nonprejudicial. The witness was allowed to testify at length to various changes in Cisneros' appearance and behavior after he quit his job at Lockheed and began working for Ditson, and her testimony was corroborated by her husband and by Cisneros' wife. It appears from the offer of proof that it was intended the jury should infer that there had been a change in Cisneros' mental condition at that time and that it had been brought about by his association with Ditson. The inference was an obvious one, and there is no reason to suppose that the jury failed to grasp it. Ample expert testimony was subsequently introduced, moreover, explicitly drawing the same conclusion.

Cisneros complains of a number of instructions given and refused. ▮▮▮▮ His proposed instruction defining torture was properly refused, as there was no evidence to warrant giving it (see *People* v. *Bender* (1945) 27 Cal.2d 164, 177 [5] [163 P.2d 8]; cf. *People* v. *Daugherty* (1953) 40 Cal.2d 876, 886 [7-9] [256 P.2d 911]) and the People did not rely on a theory of murder by torture (Pen. Code, § 189). The content of two proposed instructions on his mental condition and its effect on the issue of criminal intent was adequately conveyed to the jury by a number of other instructions on the subject given at his request. ▮▮▮▮ It was not error to give a standard instruction on criminal intent in homicide cases (CALJIC No. 307), and this instruction did not conflict with Cisneros' further instruction on presumption of criminal intent. ▮▮▮▮ Cisneros also contends that the court erred in answering in the affirmative the following question asked by the jury: "Assuming a criminal conspiracy to commit murder exists, would it necessarily follow that all members of that conspiracy be guilty of murder in the same degree?" In the circumstances the answer was proper and could not reasonably have misled the jury.

Cisneros' final contention, that the evidence is insufficient as a matter of law to sustain the verdict as to him, is manifestly without merit.

For the reasons above stated the judgments are affirmed.

Gibson, C. J., Traynor, J., McComb, J., Peters, J., White, J., and Dooling, J., concurred.

Appellants' petitions for a rehearing were denied March 28, 1962.