[Crim. No. 7067. In Bank. Aug. 5, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. ERNEST BARRAGAN LOPEZ and WILLARD ARTHUR WINHOVEN, Defendants and Appellants.

Hugh R. Manes, under appointment by the Supreme Court, and Morris Lavine for Defendants and Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Plaintiff and Respondent.

SCHAUER, J.—Ernest Barragan Lopez and Willard Arthur Winhoven were found guilty after jury trial of one count of murder and four counts of attempted murder. The jury fixed the penalty on the murder count at death as to both defendants. Each appeals from the judgments[1] rendered accordingly, from orders denying their respective motions for new trials on all counts and from orders denying

---

[1]In addition to sentence to death, each defendant was sentenced on the attempted murder counts to the state prison for the terms prescribed by law, the latter sentences to run consecutively. Pursuant to the established practice of this court we treat an automatic appeal from a death penalty judgment as including also an appeal from all other appealable judgments and orders adverse to the defendant in the same criminal action. (See e.g., *People* v. *Cavazos* (1944) 25 Cal.2d 198, 199 [153 P.2d 177]; *People* v. *Carmen* (1951) 36 Cal.2d 768, 770 [228 P.2d 281].)

their respective motions to reduce the penalty on the murder count. These appeals come to us automatically (Pen. Code, § 1239, subd. (b)) on behalf of both defendants and, as to defendant Lopez, pursuant to notice of appeal and request for record filed by his counsel.

*The Multifarious Contentions.* Both defendants contend that they were convicted by evidence obtained through an illegal search and seizure; that they were denied the "right" to have counsel present at a police "show-up" or "line-up" during which they were identified by witnesses; that they were denied the right to discover the names of certain prospective witnesses for the prosecution; that on pretrial discovery they were erroneously ordered to disclose certain names and evidence to the People; that the trial court committed numerous prejudicial errors, especially in receiving evidence of other crimes; that they were prejudiced by the court's permitting the People to proceed on a conspiracy theory although defendants were not charged with conspiracy as a separate crime; that the prosecuting attorney committed prejudicial error during his argument to the jury; that the court erroneously failed to give accomplice instructions and committed error in the giving of conflicting instructions; and that there were errors committed during the penalty phase of the trial. In addition, Lopez contends that the evidence is insufficient to support the judgment against him, especially with respect to identification; that he was required to incriminate himself; that he was not legally committed by a magistrate in that during the preliminary examination a witness was not, but should have been, excluded from the courtroom, and the trial court erroneously denied a motion to dismiss the information; that he was prejudiced because no Mexicans were on the jury; that the prosecution knowingly used perjured testimony; that notes made by one witness were improperly admitted into evidence; that he was denied a fair trial because of certain assertedly unfavorable newspaper publicity; and that he was prejudiced by the failure of the court to grant his motion for severance. Winhoven, who testified in his own behalf and, in effect, judicially admitted the crimes with which he was charged, contends that he was denied the right to counsel; that the court erred in excusing from the jury panel those prospective jurors who held conscientious objections to the imposition of the death penalty; and that the death penalty constitutes a cruel and unusual punishment.

After examination of the entire record, we have concluded that no prejudicial error is shown, that the evidence amply supports the verdicts, and that defendants have been accorded a fair trial with due process of law. Hence, the judgments should be affirmed.

*The Pleadings.* By information defendants were charged in Count I with the murder of Travis Keith. In Counts II through V, respectively, defendants were charged with the attempted murder of John Ringo, the attempted murder of Lawrence Robbins, the attempted murder of Lyle Mason, and the attempted murder of Robert Kirtz. All offenses were allegedly committed on or about July 29, 1960. In addition, Winhoven was charged with six, and Lopez with three, prior felony convictions. Lopez's motion to set aside the information (Pen. Code, § 995) was denied. Each defendant entered a plea of not guilty, admitted the prior convictions as charged, and was tried before a jury.

*Basic Facts.* All the crimes with which defendants are charged were committed in connection with the July 29, 1960, robbery of MORE, INC. (hereinafter sometimes called ''MORE''), a discount business establishment located at 3443 Sepulveda Boulevard in West Los Angeles. Lawrence Robbins, a bank messenger, regularly went to MORE on Mondays through Fridays for the purpose of collecting bank deposits from the various business units at MORE. On Friday, July 29, 1960, Robbins, following his usual procedure, drove his car into the MORE parking lot around 12:40 p.m. He parked near the front door in a No Parking zone, then entered the store. He returned to his car about 1 p.m. with several thousand dollars in cash and checks in a brief case. He backed his car from the stall and started toward the parking lot exit. At that moment a car pulled in front of him, blocking his way. Robbins saw a man wearing a mask jump from that car and run toward Robbins' car. Robbins thought something was wrong, so he put his car in reverse and began to accelerate. The masked man then drew a gun and Robbins stopped. The masked man ordered Robbins to drive on, but the car was stalled. The masked man then opened the car door and reached across Robbins to get the brief case, which was next to Robbins on the front seat. Robbins believed the gun to be a .38-caliber revolver, manufactured by either Colt or Smith and Wesson. Robbins grabbed the robber's arms and they struggled. They continued to struggle outside the car and Robbins began yelling

for help. Robbins was struck and bitten by the robber during their fighting.

John Ringo, a police officer who had stopped at MORE as a customer, heard a commotion in the parking lot. He observed two men, one of them masked, scuffling. He ran out to the parking lot and attempted to separate the two men. As he did so, he was shot in the back. He turned around and saw a man whom he identified at the trial as Winhoven. Robbins ran toward the store but was shot in the leg before he reached the building.

Edward Will, associate manager of MORE, had heard cries for help on the parking lot and ran to that area. He observed the second robber shoot Ringo; he identified Winhoven as the man who fired the shot. Will then returned to the store to trip the burglar alarm. He hastened back to the parking lot, arriving just in time to see Travis Keith, an assistant manager at MORE, shot by Winhoven while Keith was fighting with the masked robber. Keith died as a result of that gunshot wound. The murder weapon was never recovered by the State.

Lyle Mason, a MORE salesman, had followed Will onto the parking lot. He also identified Winhoven, of whom he had a full side view, as the person who shot Ringo and Keith. Mason heard several additional shots, one of which struck him in the leg. Mason then saw the two robbers get into a blue Oldsmobile parked on the lot. The car apparently would not start, so they left that car and ran toward Sepulveda. One of the men stepped in front of a 1957 red and white Ford driven by Leroy Caldwell. The robber carrying a brief case and gun and wearing a mask ordered Caldwell out of the car. Caldwell got out; the two robbers got in and sped southward on Sepulveda.

The mask worn by the one robber was described in somewhat varying ways by the numerous eyewitnesses but all the witnesses agreed that it was *some type of pullover mask which completely covered the robber's head*. Numerous witnesses compared Lopez with the masked man and stated that he was of similar build, height and weight.

Robert Kirtz was in an automobile driving south on Sepulveda near the MORE establishment when he saw two men commandeer a 1957 Ford. Kirtz followed these two men as they drove south on Sepulveda. The Ford turned on Bentley Street and Kirtz pursued it. The Ford stopped on Bentley and the man on the passenger side got out and

fired a couple of shots at Kirtz as he drove by. The second shot pierced the windshield of Kirtz's car and the bullet struck Kirtz under the left eye, missing the brain by about 1-16th inch. The wound bled profusely but he was able to continue driving on Bentley. When he reached the intersection of Palms and Bentley, he turned left; the men in the Ford, who had followed Kirtz down Bentley, turned right on Palms. Kirtz parked his car and was eventually picked up by an ambulance.

Three witnesses on Tilden Avenue, a dead-end street, saw a car similar in description to Caldwell's Ford brake suddenly near the end of Tilden Avenue, pull into a driveway, back out and speed back toward the exit from the dead-end. One witness stated that the driver appeared to be wearing some type of hat, perhaps a hunting cap. (It appears that the pullover mask had by this time been discarded.) Lopez looked like the driver. Another witness also said Lopez looked like the driver; she saw mainly the back of the driver's head as the car drove away. The driver's hair was long, black and curly, and the driver appeared to be of Latin descent. The third witness observed the back of the driver's head and part of his face as the driver looked back over his shoulder while backing out of the driveway. The driver had dark hair and a distinctive jawline. This witness stated that Lopez's jawline and dark hairline bore a strong resemblance to those of the driver. She further stated that she had never seen anyone outside of Lopez who more resembled the driver. Two of these witnesses identified Winhoven as resembling the passenger in the car on Tilden Avenue.

The blue Oldsmobile in which the robbers attempted to leave the MORE parking lot had been stolen from Richard Tautenham on the evening of July 28 but the license plates on that car at the time of the MORE robbery were not those issued to that car. The license plates then on the blue Oldsmobile belonged to a car owned by one Harold Goodwin.

Although investigating officers found no latent fingerprints on the Oldsmobile, they did discover in the car a key ring containing six keys. Subsequently, it was ascertained that those keys matched a duplicate set of keys to Winhoven's apartment which the landlady retained. The keys found in the Oldsmobile would not activate the lock on Winhoven's apartment, but an expert locksmith testified that the locks had been changed.

A payroll time card for W. A. Winhoven at Pacific Semi-Conductors Corporation in Lawndale disclosed that on July 29, 1960, Winhoven clocked in at 6:38 a.m. and clocked out at 11:55 a.m. One of the keys found on the key ring in the blue Oldsmobile hereinabove mentioned opened the tool box issued to Winhoven by Pacific Semi-Conductors. So far as the chief storekeeper knew, the only other key which would open the tool box issued to Winhoven was a duplicate retained by the storekeeper.

Winhoven took the witness stand in his own behalf. He admitted going to MORE, INC., on July 29, 1960, with a companion who wore a mask. He further specifically admitted firing the shots which struck Keith, Robbins and Kirtz. He denied, however, that Ernest Lopez was his masked companion or that Lopez had anything to do with the robbery.

*Facts further connecting Lopez and Winhoven with each other and with the* MORE *robbery.* Winhoven was released from the United States Penitentiary at McNeil Island on July 3, 1960. He arrived in Los Angeles on the evening of July 6, 1960. Prior to his confinement at McNeil Island, Winhoven had been imprisoned in the federal penitentiary at Alcatraz Island, where he met Lopez. Winhoven stayed at the New Clark Hotel in Los Angeles on the nights of July 9 and 10, 1960. He was apparently registered under the name J. W. Wenhom and the records at the hotel disclosed that telephone calls were made from his room to numbers listed in the names of Lopez's brother and mother. Winhoven admitted talking with Lopez after learning from Lopez's brother that Lopez was in the hospital, but he denied discussing the MORE robbery with Lopez.

The People also introduced evidence tending to show that Lopez had contemplated the MORE robbery. Howard Jensen testified that he had met· both Lopez and Winhoven in Alcatraz and had known each for about 15 years. According to Jensen, Lopez contacted him around mid-June or mid-July by telephone. Lopez thereafter came to Jensen's home and proposed robbing MORE, INC., stating that it would bring them around $20,000. Although Jensen indicated that he was not interested, Lopez contacted him three days later and they drove to the MORE discount house where they parked. Lopez discussed the bank messenger's routine in collecting the deposits, the time he arrived and left, and the various routes he used when he left. Lopez also stated his plan to rob the messenger by use of *modus operandi* substantially similar to

the procedure followed in the actual robbery on July 29. Jensen testified that he saw Lopez on other occasions until July 14 or 18, but that he did not again see Lopez after the latter dates until July 30, at which time Lopez mentioned, among other things, that he had lost a tooth in a fight.[2]

Robert Luna met with Lopez, a Mr. Stabler, and a Mr. Davenport (also known as Going) at a café in the Los Angeles area on July 23, 1960. Luna, who was a fugitive from justice at that time, went to the café to find out if Lopez had any robberies in mind. Lopez told them that he had "a pretty good score," that two or three people were needed for the job. When the group expressed interest in the robbery, Lopez drew a diagram of a discount house on Sepulveda Boulevard. Lopez discussed the means by which a young man could be robbed on a Friday about 11 a.m. Lopez further suggested that the robbers wear face masks so that they could not be easily identified. Lopez stated that he had been approached by another person concerning the robbery at that location, but that he did not know this other individual well. It was suggested that they drive out to the discount house, but it was Saturday and the establishment was closed, so they did not go. This concluded the discussion with regard to the robbery. Luna was captured by the police later that same day and, it will develop, eventually became a witness for the State.

The People also introduced evidence of certain other burglaries, the relevance of which, as tending to connect the defendants with each other and illustrate a characteristic *modus operandi* in criminal enterprise, will appear. On Monday morning, July 11, 1960, the proprietor of the George F. Cake Co. (a law enforcement equipment store in Monterey Park) discovered that the store had been burglarized during the weekend. Among the merchandise missing were handcuffs, badges, holsters, primers, ammunition and guns. Four of the guns taken in that burglary were found in the automobile in which Lopez and Winhoven were riding at the time of their arrest on August 31, 1960. Other missing weapons, and ammunition of a type carried by the Cake Co., were found in Room No. 7 of a motel on Western Avenue in Gardena. This room was registered in Winhoven's

---

[2]There was also testimony to the effect that Lopez had some dentistry done shortly prior to the MORE robbery, and that on August 1 he returned to the dentist's office complaining that a temporary partial bridge had been broken off.

name. The stolen items found in defendants' possession were admitted in evidence.

During the night of August 26, 1960, the Don Post Studio in North Hollywood was burglarized. Post manufactured studio props, makeup and rubber masks. A number of rubber masks, both finished and unfinished, as well as 21 wigs, a makeup kit and an electric clock, were among the items stolen. The owner of the studio stated that he was the only manufacturer of that particular type of mask outside of New York. Several masks and wigs found in defendants' possession when they were arrested were identified by Mr. Post as manufactured by him. The makeup kit and clock from the Post burglary were found in Winhoven's motel room in Gardena. These items were received in evidence.

Two days after the above related studio burglary the Brundage Sporting Goods Store in Bakersfield was burglarized. This occurred during the night of August 28, 1960. Four firearms were stolen that night. The following night (August 29) a 1960 Comet station wagon and a 1960 Mercury four-door sedan were stolen, with their keys, from the warehouse of the Kitchen-Boyd Motor Company in Bakersfield. One of the guns which had been stolen from the Brundage store the night of August 28 was found partially disassembled on the seat of the stolen 1960 Comet station wagon. Both the Comet and the Mercury were found in the latter part of the same month (August 1960). The Mercury was located in a grape vineyard about 2 miles from Lamont, approximately 13 miles southeast of Bakersfield. (The town of Lamont, the evidence will disclose, also figured in the ambitious plans of these entrepreneurs.) The Comet was found shortly thereafter in a drainage ditch about half a mile away. A license plate bearing the number PWF 673 was wired to the rear of the Comet. A license plate of the same number had been stolen from the 1957 Ford automobile of Mrs. Kay Thompson on August 28 or 29.

*The Arrest of Appellants and the Search.* About 5:25 a.m. on August 30, 1960, Winhoven was stopped in Bakersfield for a traffic violation (running a red stop light) by Officer Joseph Ragusa of the Bakersfield Police Department. Winhoven was driving a rented 1959 Nash automobile in which Lopez was the sole passenger. Officer Ragusa had called for assistance before he stopped the Nash, and Officer Mobrice arrived shortly after the vehicle was stopped. Officer Mobrice looked through the car window and observed a red-

painted crowbar protruding from under the seat on the passenger's side of the automobile, and for reasons that will hereinafter appear, suspected that the crowbar might have been used to gain entrance to the Brundage Sporting Goods Store.[3] Defendants were then ordered to get out of the car. Officer Mobrice reached into the car to pull out the crowbar, and as he did so, he pulled out some white gloves under which there was a Smith & Wesson revolver. Winhoven was then asked to open the trunk, and he complied. The officers discovered two cloth satchels in the trunk. In one of the satchels were a Colt .357, seven rubber face masks and five wigs. In the other were a box of 16-gauge shotgun shells, a box of .38-caliber wadcutters, a box of 30-06 Springfield rifle ammunition, a box of .38 special ammunition, a box of .308 rifle ammunition, a fully loaded .38-caliber Colt Cobra, a fully loaded Smith & Wesson .38-caliber revolver, a man's sock which contained five rounds of .38-caliber ammunition, four rubber face masks, three wigs and a pair of black shoes.

Officer Mobrice searched Lopez and found six keys in his trousers pocket. Lopez stated to the officers that the keys belonged to his car which he had left in Los Angeles, but it was subsequently ascertained that those keys activated various locks on the two automobiles stolen from the Kitchen-Boyd Motor Company warehouse.

Defendants were arrested and placed in the Bakersfield jail. Various police officers and an agent of the FBI questioned defendants there. Their statements, which the court found in each instance to have been freely and voluntarily made and which the jury were instructed to consider only as to the respective declarant, were received in evidence. During one of these conversations Winhoven admitted burglarizing the Brundage store and taking guns in preparation for the planned robbery of a bank in Lamont. He further stated that the guns and masks found in the Nash automobile at the time of arrest were to have been used in connection with the intended Lamont robbery; however, he asserted that the stolen articles found in the Nash had been purchased by

---

[3]The record does not unequivocally show whether the red crowbar was in fact used to effect entry at the Brundage Sporting Goods Store. It was established, however, that the red crowbar was used to break into the Kitchen-Boyd Motor Company warehouse just a few hours before defendants were arrested and about 24 hours after the Brundage burglary. The pertinent inquiry here, of course, is whether Officer Mobrice reasonably believed or suspected that the red crowbar he observed in defendants' car had been used in connection with one of these recent burglaries.

him from a Mexican in Los Angeles. Winhoven also admitted that he brought Lopez to Bakersfield to assist with the Lamont robbery and that two cars (one of which was to be kept in a vineyard), in addition to his own car, were to be used in the Lamont robbery.

*Defendants' Explanation of their Presence in the Bakersfield-Lamont Area.* Both Lopez and Winhoven stated that they arrived in Bakersfield on the evening of August 29. Winhoven then (so he stated) revealed to Lopez his intention to meet two "jitterbugs," with one of whom he had served time in Alcatraz. Lopez, it seems to be implied, did not want to see these "jitterbugs," so Winhoven let him out of the car. (The identity of these "jitterbugs"—if they have corporeal existence—is not disclosed in the record.) It was agreed that Winhoven would pick Lopez up early the next morning on the highway. Winhoven was late in arriving at the meeting place, and Lopez became chilled while waiting there. When Lopez got in the car he put on a jacket that he found in the back seat. According to Lopez the keys to the automobiles stolen from Kitchen-Boyd were found in that jacket rather than in his pants. Winhoven stated that he rented a motel room after he let Lopez out. The persons he had expected to meet did not show up. When he returned to his car there was a jacket that he had not seen before. He "presumed" that "these persons" (impliedly the "jitterbugs") had put the jacket in the car. Defendants were stopped and arrested shortly after Lopez entered the car on the morning of the 30th.

In September 1960 the hereinabove mentioned Robert Luna was placed in the same cell with Lopez in the Bakersfield jail. During the time that Luna was in that cell with Lopez they had several discussions about the MORE robbery. Shortly after each discussion Luna wrote down, partly in English and partly in Spanish, a memorandum of the conversation. During the first of these conversations, Luna stated to Lopez that he and certain others thought that Lopez was one of the participants in the MORE robbery. Lopez responded: "Yes, but I did not do it. I gave it to Red."[4] In one of these conversations Lopez indicated that he had been questioned by Los Angeles police officers. He stated that the police officers had said they had numerous witnesses who could identify him as one of the MORE robbers.

---

[4]The record indicates that Winhoven had red hair.

Lopez then stated to Luna: "How can they identify me when I was wearing a mask? . . . It is almost impossible to be identified." Apparently on a later date Lopez stated that "he removed the mask after he had gotten away from the place" and that, with respect to the shooting, "Red went ahead and did it, and that [Red] was just a crazy goon for doing it." Luna further reported that Lopez had stated that "he [Lopez] didn't think that Red would crack, but he was leery, . . . he had gotten out of the car and helped Red during the robbery and that he expected the best from him." Lopez also was asserted to have said "that they had gotten a bum car, or that the wiring on the car wouldn't work, wasn't fixed right, anyway, they couldn't get the car started so they had to take one."

The testimony given by Lopez and Winhoven when they took the stand was in substantial compliance with the statements they had made to the various law enforcement officers while they were in the Bakersfield jail, with the exception that Winhoven admitted, as hereinabove related, that he fired the respective shots that severally killed Keith and wounded Robbins and Kirtz.

*Specific Contentions.* Defendants first contend that they were convicted by the use of evidence obtained in an illegal search and seizure. It is urged that the evidence recovered from the Nash automobile at the time of their arrest was taken without probable cause for the search, that their motions to suppress the evidence taken therefrom should have been granted, and that they were denied a fair trial by the failure of the court to grant those motions.

The contention is without merit. Preliminarily, it should be pointed out that defendants did not object on this specific ground either at the preliminary hearing or during trial. However, during pretrial defendants did move to suppress the evidence taken from the Nash at the time of their arrest. In opposition to this motion the prosecuting attorney filed an affidavit incorporating certain testimony given at the preliminary hearing. At the preliminary hearing Officer Ragusa testified that he had seen a car similar to the Nash in the vicinity of the Brundage store on the morning that it was robbed. He did not see any other cars in the area, nor did he know at that time that the Brundage store had been burglarized. However, Officer Ragusa further stated that before defendants were ordered to get out of the car, Officer Mobrice had noticed the red crowbar and stated: "This crowbar has red paint on it and matches the red paint

transfer used in the burglary of the Brundage Hardware Store."

█ The police officers were amply justified in stopping defendants' automobile because of the traffic violation. After so doing, they noticed the hereinabove mentioned red-painted crowbar that Officer Mobrice suspected might have been used in connection with the Brundage burglary. Under those circumstances, the police had probable cause to arrest defendants and to make a reasonable incidental search. (*People* v. *Mickelson* (1963) 59 Cal.2d 448, 450-451 [1a] [30 Cal.Rptr. 18, 380 P.2d 658]; *People* v. *Blodgett* (1956) 46 Cal.2d 114, 117 [2-3] [293 P.2d 57]; *People* v. *Beverly* (1962) 200 Cal.App.2d 119, 125, 126 [9-14] [19 Cal.Rptr. 67]; *People* v. *Nichols* (1961) 196 Cal.App.2d 223, 228 [9-11] [16 Cal.Rptr. 328]; *People* v. *Eychas* (1960) 182 Cal.App.2d 360, 363 [2-4] [6 Cal.Rptr. 110].) The court, therefore, committed no error in refusing defendants' pretrial motion to suppress.

█ Defendants further contend that they were prejudiced by the failure of the police to permit their then joint counsel, Mrs. Barbara Warner, to attend a police "show-up" or "line-up" at which certain witnesses to the MORE robbery identified defendants. It is urged that the failure to permit Mrs. Warner to be present, after request so made, deprived defendants of their right to have counsel at all stages of the proceedings. The subject show-up was held after the filing of the complaint and arraignment of defendants, but before the preliminary examination. Defendants contend that under these circumstances the identification was in the nature of a discovery proceeding and they were entitled to have their attorney in attendance.

The testimony at the preliminary examination disclosed that the show-up was held in an auditorium seating about 400. The audience was separated from the stage by a mesh screening. This screening permitted the audience a clear view of the stage but made it difficult for those on the stage to see the audience. Persons in the show-up would sometimes speak in response to questions of the officer conducting the show-up but there was no direct oral communication between suspects and spectators. At the show-up in question both defendants spoke. This particular show-up was used as a part of the investigation relative to other cases as well as the one at bench.

It has long been an established practice of law enforce-

ment officers not to allow attorneys at show-ups. Show-ups are a part of the investigative procedure and often result in the release of a suspect. The show-up exposes suspects to view for purposes of identification or elimination but not incrimination. Only the investigating officers, assisting officers, officials interested in the administration of justice, the witnesses and the victims are permitted to attend. The practice was adhered to in the subject case.

Before trial, defendants moved to suppress the testimonies of the eyewitnesses who appeared at the police show-up on the ground that the procedure at the show-up denied defendants the right to have counsel present at that stage of the investigation and, hence, disqualified the witnesses from testifying at any stage of the criminal action.

Defendants point out that an accused is entitled to counsel at all stages of the proceedings against him. (Cal. Const., art. I, § 13; Pen. Code, § 858; *People* v. *Mattson* (1959) 51 Cal.2d 777, 788 [1] [336 P.2d 937]; *People* v. *Dotson* (1956) 46 Cal.2d 891, 895 [1] [299 P.2d 875].) To make that proposition relevant they contend that since a complaint had been filed and defendants had been arraigned, this particular show-up was different from the type of show-up at which the police are trying to reduce the number of suspects or make an identification. It is suggested that presumably Lopez and Winhoven had already been identified with at least sufficient certainty to cause a complaint to be filed and defendants to be arraigned. Therefore, it is urged, defendants were entitled to have counsel present at the show-up.

Lopez also contends that he was prejudiced because during the show-up he and Winhoven "were compelled to incriminate themselves, to exhibit themselves in various poses, to change clothes, to make statements and to do other things which required identification and statements of [*sic*] observing witnesses."

The contentions made by defendants with respect to the show-up cannot be sustained. Article I, section 13, of the Constitution provides that "In criminal prosecutions, in any court whatever, the party accused shall have the right . . . to appear and defend, in person and with counsel." The right to consult with counsel has been extended to pretrial procedures. Relevant portions of Penal Code section 858 declare: "When the defendant is brought before the magistrate upon an arrest, either with or without warrant, on a charge of having committed a public offense, the magistrate

must immediately inform him of the charge against him, and of his right to the aid of counsel in every stage of the proceedings.'' ■ Thus, a defendant has a right to the assistance of counsel (1) at arraignment (Pen. Code, § 858), (2) at the preliminary examination (Pen. Code, § 866.5; *In re James* (1952) 38 Cal.2d 302, 311 [6] [240 P.2d 596]; *McCarthy* v. *Superior Court* (1958) 162 Cal.App.2d 755, 757-759 [1-2] [328 P.2d 819]), (3) during trial (*In re Mc-Coy* (1948) 32 Cal.2d 73, 76 [1] [194 P.2d 531]; *People* v. *Lanigan* (1943) 22 Cal.2d 569, 574-577 [1] [140 P.2d 24, 148 A.L.R. 176]), and (4) upon arraignment for judgment and sentence (*In re Roberts* (1953) 40 Cal.2d 745, 748 [3] [255 P.2d 782]; *People* v. *Havel* (1955) 134 Cal.App.2d 213, 218 [3] [285 P.2d 317]). In addition one accused of the commission of crime has the right to private consultation with his counsel before trial. (*Cornell* v. *Superior Court* (1959) 52 Cal.2d 99, 102 [2] [338 P.2d 447, 72 A.L.R.2d 1116].)

■ But these rights to counsel in *pretrial stages* are granted primarily to insure early representation and adequate preparation for trial. (See *People* v. *Keelin* (1955) 136 Cal.App.2d 860, 882 [12] [289 P.2d 520, 56 A.L.R.2d 355]; see also *Cornell* v. *Superior Court* (1959), *supra,* 52 Cal.2d 99, 102 [2].) Neither article I, section 13, nor the statutes implementing the right granted therein, should be construed in a manner that would hamper legitimate police investigation when no substantial right of the accused is involved. We do not believe that the accused has a right to have counsel present during purely investigatory activities which are not designed to elicit information from the accused or otherwise impinge upon his constitutional rights.

■ The subject show-up was designed to aid the police with identification of the MORE robbers whoever they might be, with the elimination of persons possibly mistakenly suspected, and with the selection of witnesses; it was not intended to elicit information from the defendants or to have them do anything that would destroy their privilege against self-incrimination. There was no denial of due process in refusing counsel's request to attend this show-up. The competency of the eye-witnesses of the MORE robbery to testify at the trial was not affected by their observation of defendants at the show-up without the attendance of defendants' counsel.

■ Lopez's specific contention that during the show-up defendants' privilege against self-incrimination was violated

is manifestly untenable. There is no indication, on the record before us, that defendants made or were asked to make any statements that would tend to incriminate them. The privilege extends only to testimonial compulsion; requiring defendants to assume a certain pose for purposes of identification, or to speak for voice identification, is not within the privilege. (*People* v. *Duroncelay* (1957) 48 Cal.2d 766, 770 [2] [312 P.2d 690]; *People* v. *Trujillo* (1948) 32 Cal.2d 105, 112-113 [5] [194 P.2d 681].) Even in the courtroom during trial a defendant may be required to stand and remove a visor so that witnesses attempting to identify him (or, presumptively exonerate him) may have an unobstructed view of his features. (*People* v. *Clark* (1941) 18 Cal.2d 449, 460 [2] [116 P.2d 56].)

 Defendants also complain of alleged errors in connection with the court's ruling on motions for discovery. During pretrial, both defendants and the People noticed motions for discovery. The orders were granted in part and denied in part. With respect to the People's application, the court ordered defendants to produce, *inter alia*, (1) the names and addresses of persons defendants anticipated calling as alibi witnesses; (2) written statements or notes of statements by such witnesses; and (3) recordings, transcriptions of recordings and written statements or notes of statements of witnesses who had testified at the preliminary hearing. (Although the written notice of motion was directed to both defendants, the written order purported to require only Lopez and his counsel to produce the requested information.) Neither the record nor the briefs indicate that any information was given to the People as a result of the subject order. Nevertheless, defendants contend that the granting of the order denied them a fair trial.

The contention is without merit. This court has recently held that, within certain narrow limitations, the People have the right to discovery of defense evidence. (*Jones* v. *Superior Court* (1962) 58 Cal.2d 56, 59 [4], 61-62 [9] [22 Cal.Rptr. 879, 372 P.2d 919].) Even if that were not the rule, however, defendants are in no position to complain. As hereinabove mentioned, neither the record nor the briefs indicate that any information was furnished to the People as a result of the subject order. It is manifest that the mere granting of the order did not deprive defendants of a fair trial.

 Defendants further contend that they were de-

prived of a fair trial by the refusal of the court to order disclosure by the People of the names of certain prospective witnesses. In particular, during pretrial, Lopez noticed a motion for discovery, which in part sought an order directing the People "To produce and give to the attorney for defendant Lopez, the name and address of the party whom defendant Lopez assertedly requested to participate with him in the said robbery of MORE, Inc., together with the written memorandum notes, statements, and reports of the investigating police officers in relation thereto." The People filed an affidavit in which it is stated, among other things, that "the disclosure of the identity of any witness solicited by the defendant, ERNEST BARRAGAN LOPEZ, at this stage of the proceedings might jeopardize that person's welfare and safety; that the defendant, ERNEST BARRAGAN LOPEZ, by himself or through other persons, might seek to use the information gleaned at this time to coerce and intimidate and threaten said witness from speaking the truth at the trial. If it should ever become necessary to use any such witness we will gladly disclose to counsel all prior statements and reports made to police officers and would not oppose any reasonable time to investigate that individual or said report. But to disclose at this time would do violence to the proper administration of justice."

The court refused to accept the statements in the prosecutor's affidavit as constituting an adequate basis for denial of discovery. Thereupon the People called two witnesses in support of the allegations of the affidavit. The court first heard testimony from Los Angeles Police Officer Edward F. Benson. Officer Benson stated that he had spoken with two individuals who indicated to him that they had been solicited by Lopez to commit the MORE, Inc., robbery. Those two individuals (subsequently disclosed to be Luna and Jensen) had further informed him that they were in "fear of physical injury or death and they would not like anyone to know who they are." According to the police officer the two prospective witnesses were afraid of Lopez because of their knowledge of his past conduct. On cross-examination, Benson was asked if the two witnesses had been taken into protective custody. The court sustained an objection to the question (on the ground that it sought irrelevant and immaterial information); this ruling apparently was deemed necessary to prevent indirect identification of the witnesses with whatever hazards to others might ensue. It was a fact that the witness Luna was in custody but it does not appear

that his custody was solely (if at all) protective in the sense implied by the question. Luna, it will be recalled, was a fugitive preceding (and at the time of) his arrest. The court also heard testimony of the former federal probation officer who had been Lopez's supervisor when he was paroled from Alcatraz. This officer testified that Lopez had assaulted another inmate and that Lopez was considered to be a "desperate inmate and leader of disorder and likely to be a continuous menace and source of trouble."

After hearing this evidence, and, it must be presumed, viewing it in the light of the pending charges, the evidence adduced at the preliminary hearing and the magistrate's finding of probable cause, the court denied immediate disclosure of the witnesses' names but did order the People to produce the information sought by the motion at least 24 hours prior to the time the subject witnesses were to be called. This order was also made applicable to Winhoven at his request.

Defendants urge that since Lopez was in custody on a nonbailable charge the purported fear reported by the police officer was imaginary and did not furnish a sufficient basis for the court to refuse to order immediate disclosure of the witnesses' names. Defendants further contend that the withholding of the information was unjustified because one of the two witnesses, Luna, was in custody.

These contentions cannot be sustained. ▆▆▆ We have said that in the absence of "some governmental requirement that information be kept confidential for the purposes of effective law enforcement, the state has no interest in denying the accused access to all evidence that can throw light on issues in the case, and *in particular* it has no interest in convicting on the testimony of witnesses *who have not been as rigorously cross-examined and as thoroughly impeached as the evidence permits.*" (Italics added.) (*People* v. *Riser* (1956) 47 Cal.2d 566, 586 [26] [305 P.2d 1]; see also *Jones* v. *Superior Court* (1962), *supra*, 58 Cal.2d 56, 59 [2]; *Powell* v. *Superior Court* (1957) 48 Cal.2d 704, 707 [1] [312 P.2d 698].) Just as the State may have a legitimate interest in keeping confidential certain information "for the purposes of effective law enforcement," it may also *in special circumstances* have cogent reasons for keeping confidential—in order to give some assurance that the truth can be presented—the names of prospective witnesses. ▆▆▆ There must be a balancing of the right of a defendant to discover potentially material witnesses with the probability that such

discovery might lead to the elimination of an adverse witness or the influencing of his testimony. In balancing these competing factors the trial court must be allowed great discretion. (See Louisell, *Criminal Discovery: Dilemma Real or Apparent?* (1961) 49 Cal.L.Rev. 56, 99-101.) Under certain circumstances, delayed disclosure may well be appropriate. (*Ibid.*)

 The court's order delaying disclosure was, undoubtedly, a conscientious effort on the part of the court to balance the claimed right of defendants to immediate disclosure with the realistic danger inherent in such disclosure. It is the *timeliness* rather than *immediacy* of disclosure which should control. In view of the facts before the court, we cannot say that the court abused its discretion by ordering disclosure delayed until shortly before the subject witnesses were to be called.

 In any event, defendants have shown no prejudice as a result of the court's order. At the trial defendants were given full opportunity to cross-examine Luna and Jensen. At the request of counsel for Lopez, Jensen was ordered to return on the day following that on which he testified for the purpose of further cross-examination. Luna was also extensively cross-examined. His prior felony convictions were shown, certain prior inconsistent statements were revealed, and his cooperation with the police in making notes of, and thereafter narrating, Lopez's statements was thoroughly explored. In addition, there was admitted in evidence "by reference" an order dismissing (apparently on the motion of the prosecutor in the case at bench) certain criminal charges against Luna. Finally, Stabler and Going (Davenport), the other persons asserted by Luna to have been present when Lopez solicited the commission of the More robbery, were called by the defense. Each of them denied that Lopez had made the statements attributed to him by Luna. From all that appears in the record, Luna was as "rigorously cross-examined and as thoroughly impeached" (*People* v. *Riser* (1956) *supra,* at p. 586 [26] of 47 Cal.2d) as the evidence permitted. Thus, even were we to assume for the purposes of defendants' contention that the court erred in making the subject order no prejudice would appear to follow.

 Lopez raises an additional contention with respect to Luna's testimony. It is urged that the statements which, according to Luna, were made by Lopez in the Bakersfield jail constituted admissions obtained by trickery. Lopez as-

serts that Luna was purposely planted in his jail cell in order to obtain damaging statements from him; he contends that the statements so secured were a product of trickery and deceit by the State and that their use constitutes a denial of due process.

When either physical or psychological coercion is present, the admissibility of a defendant's admission or confession (insofar as the federal Constitution is concerned) is determined by inquiring "whether the behavior of the State's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined—a question to be answered with complete disregard of whether or not petitioner in fact spoke the truth." (*Rogers* v. *Richmond* (1960) 365 U.S. 534, 544 [81 S.Ct. 735, 5 L.Ed.2d 760, 768]; see also *People* v. *Ketchel* (1963) 59 Cal.2d 503, 519-522 [7] [30 Cal.Rptr. 538, 381 P.2d 394].) In this case there was no behavior by the State's law enforcement officers that overbore defendant's will to resist nor is there any indication that his admissions were anything but "freely self-determined." (*Rogers* v. *Richmond* (1960) *supra,* at p. 544 of 365 U.S. [5 L.Ed.2d at p. 768].) Moreover, there is shown no mental or physical coercion; no invasion of privacy; and no inducement by Luna that caused the subject statements to be made by Lopez. In the absence of such factors, a declarant assumes the risk that the person to whom he makes damaging statements may repeat those statements in court to be used against the declarant. (*Lopez* v. *United States* (1963) 373 U.S. 427, 438-439 [83 S.Ct. 1381, 10 L.Ed.2d 462, 470, 477].) There was no violation of due process in placing Luna in the Bakersfield jail cell with Lopez or in permitting Luna to testify as to his conversations with Lopez.

Except only insofar as concerns consultation with his attorney in a room designated for that purpose, a prisoner has no right of privacy in a jail. (*People* v. *Morgan* (1961) 197 Cal.App.2d 90, 93 [3] [16 Cal.Rptr. 838], cert. den. 370 U.S. 965 [82 S.Ct. 1606, 8 L.Ed.2d 830].)

As hereinabove mentioned, Luna made notes of certain conversations he had with Lopez in the Bakersfield jail. Lopez presents three additional contentions with respect to these notes. He urges (1) that the subject notes were not produced in response to the pretrial discovery order, (2) that there was no foundation laid by showing chain of possession after the notes left Luna's possession in the Bakersfield

jail, and (3) that the notes were improperly read into the record and subsequently admitted in evidence.

These contentions are all without merit. · The record does not indicate that the notes were in the district attorney's possession so that he could have produced them in response to the discovery order. In any event, no claim of surprise was made when the notes were produced and no objection was interposed to their use to refresh Luna's memory.

Nor may Lopez successfully contend on appeal that no proper foundation was laid for the introduction of this documentary evidence when no such objection was presented in the lower court. (*Supreme Grand Lodge* v. *Smith* (1936) 7 Cal.2d 510, 514 [3] [61 P.2d 449]; *Fernandez* v. *Consolidated Fisheries, Inc.* (1953) 117 Cal.App.2d 254, 259 [1] [255 P.2d 863].) Likewise, the presently urged objection that the offering party could not read the memoranda into the record and seek their admission in evidence (cf. *People* v. *Keelin* (1955) 136 Cal.App.2d 860, 876, 879 [9-10] [289 P.2d 520, 56 A.L.R.2d 355]) cannot be sustained in the absence of an objection below. (*Nizuk* v. *Gorges* (1960) 180 Cal.App.2d 699, 709 [12] [4 Cal.Rptr. 565]; *D. A. Parrish & Sons* v. *County Sanitation Dist.* (1959) 174 Cal.App.2d 406, 413 [5] [344 P.2d 883].)

Defendants also complain of the admission of evidence of other crimes. They refer to the evidence of the Cake Co. burglary, committed prior to the MORE robbery, and that of crimes committed subsequent to the MORE robbery— the Brundage Sporting Goods Store burglary, the Don Post Studio burglary, the Kitchen-Boyd burglary, the theft of a license plate from Mrs. Kay Thompson, and the evidence of the planned robbery of the Lamont bank.

This evidence of other crimes was introduced by the People to show a sustained and continuing course of criminal concert between Lopez and Winhoven. The subject evidence was relevant to the issue of the identity of the masked robber who was directing Winhoven at MORE, Inc. "It is settled in this state . . . that except when it shows merely criminal disposition (*People* v. *Cook* (1905) 148 Cal. 334, 340 [83 P. 43]; *People* v. *Glass* (1910) 158 Cal. 650, 658 [112 P. 281]), evidence that is relevant is not excluded because it reveals the commission of an offense other than that charged.

The general tests of the admissibility of evidence in a criminal case are: . . . does it tend logically, naturally, and by reasonable inference, to establish any fact material for

the people, or to overcome any material matter sought to be proved by the defense? If it does, then it is admissible, whether it embraces the commission of another crime or does not, whether the other crime be similar in kind or not, whether it be part of a single design or not.' '' (*People* v. *Peete* (1946) 28 Cal.2d 306, 314-315 [1] [169 P.2d 924].)

There was ample evidence from which the jury could have inferred that Lopez and Winhoven had conspired to rob the Lamont bank. The evidence of that conspiracy was relevant because it tended to establish the identity of the masked MORE robber by showing a plan to commit a crime substantially similar in design to the MORE robbery. (*People* v. *Cavanaugh* (1955) 44 Cal.2d 252, 265 [8] [282 P.2d 53]; *People* v. *McCarty* (1958) 164 Cal.App.2d 322, 325-327 [1a-4] [330 P.2d 484].) Despite defendants' protestations to the contrary, it is long and firmly established law that conspiracy need not be pleaded as a basis for the reception of evidence which shows the existence of one. (*People* v. *Pike* (1962) 58 Cal.2d 70, 88 [15] [22 Cal.Rptr. 664, 372 P.2d 656]; *People* v. *Ditson* (1962) 57 Cal.2d 415, 447 [22] [20 Cal.Rptr. 165, 369 P.2d 714].)

The evidence of the remaining crimes was also relevant to the issue of identity. The jury could have inferred from the evidence that Lopez and Winhoven were constantly associated as partners in crime during late July and August of 1960. By establishing the active criminal partnership (see *People* v. *Lapierre* (1928) 205 Cal. 462 [271 P. 497]), the People offered probative evidence tending to establish the identity of Winhoven's masked commander at MORE.

Both defendants contend that Jensen was an accomplice as a matter of law. They urge that the court erred in failing so to instruct the jury and in failing to instruct the jury that the testimony of an accomplice ought to be viewed with distrust. (Code Civ. Proc., § 2061, subd. 4.) Lopez makes a similar contention with respect to Luna and his testimony.

Penal Code section 1111 defines an accomplice ''as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.'' A requested instruction that a witness is an accomplice should be given only if undisputed evidence establishes the complicity of that witness. (*People* v. *Duncan* (1960) 53 Cal.2d 803, 816 [6b]

[3 Cal.Rptr. 351, 350 P.2d 103].) Jensen discussed with Lopez a plan for robbing the bank messenger and drove to the MORE location with Lopez to observe the movements of that messenger. These acts occurred before Winhoven was released from the prison at McNeil Island. The record is devoid of any evidence that Jensen conspired with Lopez and Winhoven to commit the MORE robbery on July 29, or that he in any way participated in their plans to consummate that robbery. Although Luna had a conversation with Lopez on July 23, 1960, concerning the MORE robbery, no action toward perpetration or encouragement of this robbery appears to have been taken by Luna; it will be recalled that Luna was arrested as a fugitive later that same day. No active complicity on the part of Luna was shown with respect to the July 29 crime. Thus, the requested instructions that, as a matter of law, Jensen and Luna were accomplices were properly rejected.

 Defendants next contend that they were prejudiced by misconduct of the prosecuting attorney with the result that they were denied a fair trial. First, they urge that their cause was prejudiced by repeated, and assertedly improper, references to their having been incarcerated in Alcatraz. During his opening statement, the prosecuting attorney declared that the People would show that defendants had known each other in Alcatraz. Winhoven objected and cited the remark as misconduct. The objection was sustained and the jury were admonished to disregard the statement concerning Alcatraz.[5] Subsequently, during its case in chief, the People elicited from Jensen, without objection, the fact that he had known defendants in Alcatraz. Finally, when defendants had taken the stand each admitted on cross-examination, without any objection interposed, that he had met the codefendant while imprisoned at Alcatraz. We perceive no error, in these circumstances, in the references to Alcatraz. (Cf. *People* v. *Kerfoot* (1960) 184 Cal.App.2d 622, 646-648 [8a-12] [7 Cal.Rptr. 674].)

 Lopez also cites as misconduct several remarks made during the argument on the penalty phase. At one point, the prosecuting attorney suggested that the reason a certain witness was not called by Winhoven was that the witness would not lie for him. An objection to the statement that the witness would not lie for Winhoven was sustained. An

---

[5]The jury were further instructed that the remarks of counsel made in the course of the opening statement did not constitute evidence.

objection to the prosecutor's observation that he had never seen a more cold-blooded killing was overruled. There was no error in the court's rulings on these objections, and no prejudice is shown. (See *People* v. *Lyons* (1958) 50 Cal.2d 245, 262 [12-14] [324 P.2d 556].)

■ In addition, Winhoven contends that certain comments constituted prejudicial misconduct. He refers to the prosecutor's observations that Winhoven was a cold-blooded killer, that Winhoven might like to dance on Mr. Keith's grave, and to the prosecutor's speculation if defendants played blackjack or shot craps or played casino while Mr. Keith lay in the morgue.[6] No objection was interposed to any of these remarks. ■ Generally, the defendant may not complain on appeal of the effect of the prosecutor's remarks where no objection has been made. (*People* v. *Lyons* (1958) *supra,* 50 Cal.2d 245, 262 [12].) ■ Moreover, the prosecuting attorney "has a wide range in which to state his views as to what the evidence shows and as to conclusions to be drawn therefrom." (*People* v. *Burwell* (1955) 44 Cal.2d 16, 40 [34] [279 P.2d 744].) ■ The bounds of permissible comment were not exceeded in this case.

■ *Lopez's Specific Contentions.* Lopez urges that his commitment to the superior court was without authority and that his motion in that court to set aside the information under Penal Code section 995 was, therefore, erroneously denied. The asserted illegality is based upon the magistrate's failure to exclude from the courtroom at the preliminary hearing one Max Herman, an investigating officer, upon defendant's motion, now claimed to have been based on Penal Code section 868.[7] (See *People* v. *Elliot* (1960) 54 Cal. 2d 498, 503 [4] [6 Cal.Rptr. 753, 354 P.2d 225].)

The record does not support defendant's contention.[8]

---

[6]There was evidence that after the robbery, Winhoven went to Las Vegas where he won some money gambling.

[7]At the time here pertinent Penal Code section 868 read as follows: "The magistrate must also, upon the request of the defendant, exclude from the examination every person except his clerk, court reporter and bailiff, the prosecutor and his counsel, the Attorney General, the district attorney of the county, the defendant and his counsel, and the officer having the defendant in custody; provided, however, that when the prosecuting witness is a female she shall be entitled at all times to the attendance of a person of her own sex."

[8]The transcript of the preliminary examination shows the following: "MR. BUSCH [the prosecuting attorney]: The People are ready. The People call Dr. Mills.

"MRS. WARNER [defendants' attorney]: Before the People call their

Rather, the record discloses that defendant's motion was made under Penal Code section 867.[9] The provisions of section 867, relating specifically to the exclusion of witnesses, are discretionary whereas the terms of section 868, relating to the exclusion of persons generally, are mandatory. (*People* v. *Elliot* (1960), *supra*, 54 Cal.2d 498, 504 [8].) Defendant's motion sought only the exclusion of witnesses; none of the persons enumerated in section 868 were mentioned by the motion. In the absence of a specific statement that the motion was made under section 868 or of phrasing the motion in the language of section 868, defendant's motion must be considered to have been based on section 867. (See *People* v. *Boyden* (1953) 116 Cal.App.2d 278, 283 [1] [253 P.2d 773]; cf. *People* v. *Prizant* (1960) 186 Cal.App.2d 542 [9 Cal.Rptr. 282].) It was, therefore, discretionary with the magistrate to exclude Herman or not. We find no abuse of discretion in permitting Herman to remain in the courtroom at the preliminary examination.

 Lopez also contends that he was prejudiced by the court's failure to grant his motion for severance when Winhoven elected to represent himself. Section 1098 of the Penal Code provides for the joint trial of "two or more defendants . . . jointly charged with any public offense . . . unless the court order separate trials." The court has great discretion when dealing with motions for severance under section 1098. (See *People* v. *Pike* (1962), *supra*, 58 Cal.2d 70, 85 [3].) Considering the nature of the crimes charged and the method of their accomplishment, we find no abuse of discretion in denying the motion for severance.

 Finally, Lopez contends that he was prejudiced by the introduction during the penalty phase of portions of prison disciplinary reports compiled while he was in Al-

first witness, your Honor, the defendants move to clear the court room of all witnesses.

"THE COURT: The request is that all witnesses other than the one testifying shall be outside the court room.

"MR. BUSCH: Very well, your Honor. I would like to have my officer here as an advisor.

"THE COURT: You are entitled to have an assistant." Thus, Herman was permitted to remain and defendants made no objection.

[9]Penal Code section 867 reads as follows: "While a witness is under examination, the magistrate may exclude all witnesses who have not been examined. He may also cause the witnesses to be kept separate, and to be prevented from conversing with each other until they are all examined."

catraz. The records were identified by a Mr. Weaver, who testified that he was the record control supervisor at Alcatraz Penitentiary. The disciplinary reports were prepared in the regular course of duty by the officer who observed an infraction of prison rules. Lopez now urges that these records were hearsay and inadmissible. The trial court examined the subject reports with care. Numerous portions, which in the trial court's opinion did not come from proper sources of information, were stricken; notations of events actually witnessed by the person making the report were admitted.

The People sought introduction of the subject documents to show defendant's "background and history" (Pen. Code, § 190.1). It was urged that the disciplinary reports were admissible under the Uniform Business Records as Evidence Act. (Code Civ. Proc., §§ 1953e-1953h; Stats. 1941, ch. 482, § 1.) Section 1953e of the Code of Civil Procedure provides: "The term 'business' as used in this article shall include every kind of business, profession, occupation, calling or operation of institutions, whether carried on for profit or not." Section 1953f of the Code of Civil Procedure reads as follows: "A record of an act, condition or event, shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

The disciplinary reports fall within the purview of the Uniform Business Records as Evidence Act. Those records were prepared in the regular course of the operation of an institution (Code Civ. Proc., § 1953e, *supra*), and they were identified by the custodian as to mode of preparation. The court, by its rulings, received in evidence only those records as to which, in the court's opinion, "the sources of information, method and time of preparation were such as to justify" their admission. There was no error in this respect.

*Winhoven's Specific Contentions.* Winhoven contends that he was denied a fair trial because the court refused to appoint counsel to *assist* him in representing himself during the course of trial. He also urges that he was unable to represent himself adequately because he was suffering from angina pectoris. Finally, he asserts that he was denied a fair trial because the court permitted him to confess on the wit-

ness stand, which, it is argued, was tantamount to accepting a plea of guilty without counsel in violation of Penal Code section 1018.

All these contentions are without merit. The issue raised by Winhoven's demand for appointment of an attorney to act not as an attorney but only as an assistant to Winhoven *in propria persona* was carefully considered in *People* v. *Mattson* (1959), *supra,* 51 Cal.2d 777. We there held (p. 789 [2] of 51 Cal.2d) that while a defendant "has the right to appear and defend in person *and* with counsel, defendant is not entitled to have his case *presented* in court *both by himself and by counsel* acting at the same time or alternating at defendant's pleasure." In the case at bench the court repeatedly advised and urged Winhoven to accept appointment of counsel. Winhoven rejected the court's solicitations. "[T]he court cannot force a competent defendant to be represented by an attorney." (*People* v. *Mattson* (1959), *supra,* 51 Cal.2d 777, 788-789 [1].) Although Winhoven now asserts that he was incapacitated by his heart condition, it appears that he was competent to and did actively represent himself. He presented numerous objections throughout the trial, some of which were sustained. Moreover, the court was continuingly solicitous of his rights and offered advice to Winhoven whenever it appeared proper to do so. Under these circumstances, there was no denial of a fair trial because of the court's ruling on Winhoven's request for assistance by subservient counsel. Winhoven's contention that his testimony amounted to a confession, hence was tantamount to a plea of guilty, and that such a plea cannot be accepted without the attendance of counsel is patently untenable.

Winhoven further contends that the court committed prejudicial error in questioning him about a potential defense witness, one Jack Bishop, who was an inmate in the federal prison at McNeil Island, Washington. Winhoven applied to the court for an order to transport Bishop to Los Angeles. In support of his request Winhoven filed an affidavit in which he alleged that he intended to use Bishop as an alibi witness. The court, on its own motion, called Winhoven to the witness stand. He testified, out of the jury's presence, to the necessity for bringing Bishop to Los Angeles and to the information he expected to elicit from Bishop.

Bishop was brought to Los Angeles but he did not testify at the trial. In order to cast doubt on certain portions of

Winhoven's testimony the prosecutor asked questions, in the nature of impeachment, with respect to the affidavit filed by Winhoven. The prosecutor also commented during argument on the failure of Bishop to testify. There is no showing of error, but even if there were, Winhoven cannot demonstrate prejudice in view not only of the overwhelming direct and circumstantial evidence from other witnesses but also because of the words from his own mouth.

Defendants' remaining contentions have been considered but are so devoid of merit as to require no discussion. For all the reasons hereinabove discussed, the judgments are affirmed.

Gibson, C. J., Traynor, J., McComb, J., Peters, J., Tobriner, J., and Peek, J., concurred.

Appellants' petitions for a rehearing were denied September 4, 1963.