Filed 12/30/14  P. v. Moore CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E058742 |
| v. | (Super.Ct.No. SWF1102738) |
| CHARLES AUGUSTUS MOORE, | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Mark Mandio, Judge.

Affirmed with directions.

Richard Schwartzberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Natasha Cortina and Kelley Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted defendant and appellant Charles Augustus Moore of assault with intent to commit rape (Pen. Code, § 220, count 1),[1] assault with intent to commit sodomy (§ 220, count 2), oral copulation by force (§ 288a, subd. (c)(2), count 3), criminal threats (§ 422, count 4), and assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1), count 5). The trial court sentenced defendant to an aggregate term of 10 years 8 months.

In this appeal, defendant contends the trial court erred in admitting evidence of his statements to police because the statements were involuntarily obtained through the use of express or implied promises and improper influence. Defendant also maintains the court should have stayed his sentence on count 4 because the sexual assault crimes in counts 1 through 3 and the criminal threats in count 4 were committed simultaneously. Finally, defendant contends we must correct the abstract of judgment to accurately reflect that he was convicted of assault by means of force likely to produce great bodily injury in count 5.

The People concede the latter contention, and we will order the abstract of judgment to be corrected. In all other respects, we reject defendant's contentions and conclude no error occurred. Accordingly, the judgment will be affirmed.

## I. FACTUAL BACKGROUND

Jane Doe met defendant when she was a freshman in high school and defendant was a senior. Doe thought defendant was a "nice guy," and she and defendant quickly

---

[1] All further statutory references will be to the Penal Code unless otherwise noted.

2

became friends because they "got along great." Doe was not attracted to defendant in any romantic way, and the two never had a girlfriend/boyfriend relationship. Doe's friendship with defendant continued through high school and past their respective graduations. By 2011, Doe considered defendant to be her best friend. Doe trusted defendant, and thought of him as a big brother.

In October 2011, Doe was 20 years old and living with her family in Moreno Valley. Defendant lived near Doe's home, and the two socialized on an almost daily basis. On the evening of October 27, 2011, Doe called defendant to see if he wanted to "hang out" after he got off work. Defendant agreed, and arrived at Doe's home about 11:00 or 11:30 p.m.

Defendant brought two 24-ounce cans of "Four Loko"[2] with him, and he and Doe each drank one of them. About an hour later, defendant and Doe decided to go to the store and purchase more "Four Loko." Defendant drove Doe in his car to a nearby convenience store and purchased two smaller cans of "Four Loko." Afterwards, Doe and defendant went to Walmart, where they spent several minutes looking at clothes. As they were leaving Walmart, defendant suggested they drive out to Jack Rabbit Trail, a narrow dirt road along the cliffs where their friends often rode dirt bikes. Doe, now driving defendant's car, agreed, and they drove out to Jack Rabbit Trail, which was about 15 minutes away off Interstate 60 in an easterly direction.

---

[2] "Four Loko" is an alcoholic beverage which contains a mixture of beer, liquor, and energy drink.

3

While they were on Jack Rabbit Trail, defendant said he wanted to drive. Doe told defendant they should wait to switch drivers until they got back to the main road, which was less treacherous. By this time, defendant had consumed his own "Four Loko" drink, and half of Doe's, so Doe believed it would be safer for her to continue to drive until the roadway straightened out at Gilman Springs Road.

As they approached Gilman Springs Road, Doe stopped the car and turned the motor off in order to switch positions with defendant so he could drive. Defendant got out and walked around the vehicle to the driver's seat, while Doe moved to the passenger seat. After smoking a cigarette, Doe reached over to the car key, which was still in the ignition, in order to start the vehicle so they could drive home.

Suddenly, defendant grabbed Doe around the neck in a kind of chokehold, and yanked Doe's head down towards his waist. Doe thought defendant was "messing around" and making some kind of joke at first, but as defendant tightened his grip and failed to release her, Doe became frightened. Doe told defendant to let her go and she tried to remove his hand from her neck, but defendant would not budge. Doe, who was having difficulty breathing by this point, got really scared and started to panic.

Doe leaned against the passenger door, trying to push her body away from defendant, and began to kick him in the stomach. Doe managed to unlatch the door and push herself out of the car, landing on her back. Defendant jumped out of the passenger door on top of Doe, and began attacking her. Doe kicked defendant in the stomach and groin area, but she was not strong enough to overpower him. During the struggle, Doe

4

asked defendant: "Why? Why are you doing this?" Defendant responded, "It's because I love you," which was shocking to Doe since defendant had never mentioned this before. Doe told defendant this was not the proper way to go about making such a pronouncement, and the struggle continued.

Defendant regained his hold on Doe's neck while she continued to try and fight. Defendant ordered Doe to remove her pants, and threatened to kill her if she did not comply. Doe, who was scared and afraid for her life, eventually complied. Doe pulled her pants down to her ankles, and defendant yanked the pants the rest of the way off Doe and threw them in the car.

By this time, the momentum of the struggle had moved Doe around to the driver's side of the vehicle. Defendant grabbed Doe's head by the hair and pushed her down into the driver's seat on her stomach, with Doe's feet still outside the car. Defendant pulled his pants down, and tried to penetrate Doe's vagina with his penis. When defendant failed to achieve an erection, he spit on his fingers, rubbed Doe's vagina, and again tried to penetrate her. Doe felt defendant's penis pushing against her vagina, causing pain. Defendant again failed to sustain an erection. Defendant next tried to penetrate Doe's anus with his penis, though he still did not have an erection.

Defendant then ordered Doe to "get on [her] knees" and "suck his penis." Doe complied with defendant's command because she was scared. Defendant told Doe he was dissatisfied with the way she was orally copulating him. Defendant tried to bend Doe over, but Doe resisted and defendant's effort failed. Defendant then ordered Doe to

5

orally copulate him again. Doe pretended to get on her knees, but managed to push defendant backwards instead. As defendant fell back, Doe jumped in the car and slammed the door.

Doe started the car, and began to roll up the driver's side window. Before she could close it all the way, defendant jumped up, reached in through the window, and grabbed Doe's hair. Doe managed to continue rolling up the window, trapping defendant's arm inside the car. Doe started driving away while defendant continued to hang onto her hair and tried to open the car door. At some point, defendant asked Doe to stop, telling her he was sorry. Doe told defendant she would slow the vehicle if he would let go of her hair. As Doe slowed down, defendant finally released her hair and fell away from the car. Doe immediately stepped on the gas and drove towards her home.

As she drove, Doe called her parents. She was upset, crying, and frightened. Doe told her father that defendant had raped her. Doe's father told her to come home, and he stayed on the telephone with her until she arrived 15 minutes later. Doe's parents were waiting outside the house when they saw their daughter approaching, driving defendant's vehicle. Doe got out of the car wearing only her shirt, without any pants or underwear. She was crying and upset. Doe's father grabbed her and hugged his daughter. He noticed that Doe had red marks around her neck and her feet were all scraped up. Doe's mother took Doe inside the house to get her some clothes while Doe's father called the police. When the police arrived, they took a statement from Doe and told her she needed to go to the hospital.

6

Doe's mother drove her to the Riverside County Regional Medical Center where Doe was examined by a SART (Sexual Assault Response Team) nurse. Doe told the nurse that her friend, defendant, assaulted her. Doe stated that defendant choked her, dragged her by her hair, and threatened to kill her if she did not have sex with him. The nurse examined Doe and found multiple abrasions on her hands, forearms, upper arms, chest, knees, and feet. The right side of Doe's head was swollen and had a raised bump on the skin. Some of Doe's hair had been pulled out by the root. Doe suffered injuries to her genitalia consistent with her report of a forcible sexual assault.

In the interim, California Highway Patrol officers detained defendant on Gilman Springs Road near Jack Rabbit Trail. Defendant, who was evaluated by paramedics and determined to be alert, oriented, and cognitively sound, was transported to the hospital, treated for minor injuries, and released. Defendant was subsequently taken into custody by Riverside County deputy sheriffs, who interviewed him at the Hemet police station. Defendant initially denied any knowledge of the assault on Doe, and claimed to have blacked out after playing dice at Doe's house the evening before. Following additional questioning, defendant admitted having choked and hit Doe, before forcing her to orally copulate him.

Defendant did not testify at trial. A friend of both Doe and defendant testified that she believed Doe has a tendency to "spin the truth."

## II. DISCUSSION

A. *Applicable Law*

A criminal conviction which is the product of coercive police activity is involuntary, and therefore inadmissible at trial as violative of federal and state due process requirements. (*Colorado v. Connelly* (1986) 479 U.S. 157, 163-167 [93 L.Ed.2d 473, 107 S.Ct. 515]; *Lego v. Twomey* (1972) 404 U. S. 477, 483 [30 L.Ed.2d 618, 92 S.Ct. 619]; *People v. Benson* (1990) 52 Cal.3d 754, 778.) When a defendant claims his or her confession was involuntary, the People bear the burden to demonstrate the statements were voluntary by a preponderance of the evidence. (*People v. Jones* (1998) 17 Cal.4th 279, 296.)

"In evaluating the voluntariness of a statement, no single factor is dispositive." (*People v. Williams* (2010) 49 Cal.4th 405, 436, citing *People v. Williams* (1997) 16 Cal.4th 635, 661.) The court considers the totality of the circumstances, including factors relating to the interrogation itself as well as the personal characteristics of the accused. (*People v. Carrington* (2009) 47 Cal.4th 145, 169, citing *Withrow v. Williams* (1993) 507 U.S. 680, 693 [123 L.Ed.2d 407, 113 S.Ct. 1745]; see also *People v. Massie* (1998) 19 Cal.4th 550, 576.) Relevant considerations include: "'[T]he crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.'" (*People v. Williams, supra*, 16 Cal.4th at p. 660, citing *Withrow v. Williams, supra,* at p. 693.) "The test for determining whether a

8

confession is voluntary is whether the [witness's] 'will was overborne at the time he confessed.'" (*People v. Maury* (2003) 30 Cal.4th 342, 404; see also *People v. Carrington, supra,* at p. 169.)

A statement may be coerced by either physical intimidation or psychological pressure.  In cases of psychological coercion, the question is """"whether the influences brought to bear upon the accused were 'such as to overbear [the accused]'s will to resist and bring about confessions not freely self-determined.'"""  (*People v. Maury, supra,* 30 Cal.4th at p. 404.)  """"[T]he courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.'"""  (*People v. Williams, supra*, 49 Cal.4th at p. 436; see also *People v. Ray* (1996) 13 Cal.4th 313, 340.)

It is well established that "mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary.  [Citation.]"  (*People v. Jimenez* (1978) 21 Cal.3d 595, 611, overruled on other grounds in *People v. Cahill* (1993) 5 Cal.4th 478, 509-510, fn. 17.)  The police "are not precluded from discussing any 'advantage' or other consequence that will 'naturally accrue' in the event the accused speaks truthfully about the crime."  (*People v. Ray, supra*, 13 Cal.4th at p. 340.)  However, the "line between a threat (or a promise) and a statement of fact or intention can be a fine one."  (*People v. Thompson* (1990) 50 Cal.3d 134, 169.)  When evaluating a claim of psychological coercion, "we must exercise great care not to become confused:

9

intellectual persuasion is not the equivalent of coercion." (*People v. Ditson* (1962) 57 Cal.2d 415, 433.)

In reviewing the trial court's ruling regarding whether a statement was coerced, we examine the entire record, deferring to the trial court's credibility determinations and findings of fact where supported by substantial evidence. (*People v. Boyer* (2006) 38 Cal.4th 412, 444.) We may independently review the trial court's determination where, as here, the interview was recorded. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1093; see also *People v. Vasila* (1995) 38 Cal.App.4th 865, 873.)

B. *The Admission of Defendant's Statements*

Before trial, defendant sought to suppress evidence of his videotaped statements to police on the ground that these statements were involuntarily obtained. The trial court conducted an Evidence Code section 402 hearing concerning the admissibility of defendant's statements.

At the hearing, Riverside County Deputy Sheriff Jose Ambriz testified that he interviewed defendant at approximately 8:00 a.m. on October 28, 2011. Defendant was advised of his constitutional rights, and agreed to speak to Deputy Ambriz and his partner, Corporal Carroll. There was no indication defendant did not feel well during the interview, and defendant did not appear to be under the influence of any substance. Defendant seemed to understand the officers' questions, and responded in an appropriate manner.

10

During the interview, Corporal Carroll told defendant that he needed to be "completely honest with [them] right now" before the charges against him could be determined. Corporal Carroll told defendant the victim was making "some pretty serious allegations" against him, and that defendant had this opportunity to "clear [his] name." The corporal added: "The things that happened last night could be legit things that are totally fine." Deputy Ambriz told defendant: "I mean, we're not gonna make you talk, but at the same time, you know, it's up to you." Corporal Carroll told defendant: "We're here to help you out."

The officers emphasized that defendant needed to be "completely honest." At one point, Corporal Carroll told defendant: "I've been 22, man, all right? I've been 22 years old, drinkin' beers with women." "I been in your shoes. I know how things can get started with . . . the ladies out there, all right." The corporal added: "Friendships turn into other things, okay. She could have been leadin' you on, I don't know. I wasn't there. But we're all human. We're all guys. I've been in your shoes, trust me. Like I said, we're here to help you out, but we can't help you out unless you help us out, tell us what happened." Following additional questioning, defendant admitted having choked and hit Doe, before forcing her to orally copulate him.

Deputy Ambriz videotaped defendant's interview, which lasted about an hour. Before ruling on defendant's motion to suppress evidence of his statements, the trial court

11

watched the first 22 minutes of the videotaped interview.[3] The trial court determined evidence of defendant's statements to be admissible, stating:

"[W]hat I'm seeing here, he's [defendant's] administered his—he's explained his *Miranda*[4] rights and he proceeds to speak to the officers. And I'm watching his behaviors, his body language, the rapidity of his response to questions, and he seems to understand what's being asked of him. He gives answers that are logical based on the questions. He interjects with information that's logical based on the context of the conversation. I don't see what's involuntarily [*sic*] about this."

C. *Defendant's Statements Were Voluntary*

Defendant claims the trial court incorrectly found defendant's statements to have been voluntarily given because the statements resulted from the officers' direct or implied promises and exertion of improper influence. We disagree.

Initially, we reject the People's contention that defendant has forfeited any issue on appeal relating to the alleged involuntariness of his statements. According to the People, defendant argued his statements were involuntary in the trial court, while in this

---

[3] Defense counsel informed the court that no significant changes or events transpired during the remaining minutes of the videotaped interview. The court stated that it would review the videotape in its entirety later that morning, and reopen the hearing if anything took place that would cause a change in the court's ruling. No further hearing concerning admissibility of defendant's statements is evidenced in the record. The jury watched the entirety of the videotaped interview.

[4] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 684, 86 S.Ct. 1602].

appeal defendant maintains his statements were coerced. We find any such semantic variance to be a distinction without significant difference, and accordingly reject the People's waiver argument.

We consider defendant's interview with the police officers in its totality, evaluating what defendant reasonably understood from the officers' statements. (*People v. Ramos* (2004) 121 Cal.App.4th 1194, 1203.) "'"The question posed . . . in cases of claimed psychological coercion is whether the influences brought to bear upon the accused were 'such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.' [Citation.]" [Citation.]' [Citation.]" (*People v. Vance* (2010) 188 Cal.App.4th 1182, 1212, citing *People v. Thompson, supra,* 50 Cal.3d at p. 166.)

During defendant's interview, much of the officers' conversation focused on whether defendant had any explanation for Doe's accusations. According to defendant, the officers' statements that they had experienced similar situations with women, and were there to help defendant, were designed to overcome defendant's will to resist, and lead him into making incriminatory statements. While defendant's assessment of the officers' underlying motivations may be true, it does not mean any impropriety occurred during defendant's interview. The officers were permitted to express a sympathetic, personal view of defendant's crimes, real or feigned, in order to encourage a confession, without rendering it involuntary. (See *People v. Holloway* (2004) 33 Cal.4th 96, 116 [officer's suggestion that killings might have been accidental or the product of a drunken

13

rage did not invalidate a confession]; *People v. Bradford* (1997) 14 Cal.4th 1005, 1043 [officer's efforts to establish rapport with the defendant do not constitute coercion]; *People v. Vance, supra*, 188 Cal.App.4th at p. 1212 [no "implied promise of leniency" in statement that "'[w]e are here to listen and then to help you out'"].)

Defendant's reliance on other circumstances surrounding his interview to support a finding of involuntariness are equally unavailing. Defendant states he was exhausted and medicated at the time of his interview. However, Deputy Ambriz testified that defendant never fell asleep or complained of feeling unwell during the interview. Defendant did not appear to be under the influence of any substance at the time.[5] The trial court's review of the videotape revealed defendant to be alert and appropriately responsive to the officers' questions.

Defendant claims he was young and unsophisticated. However, defendant was 22 years old at the time of the interview and a high school graduate who appeared to be of normal intelligence. Defendant had a job at the Panda Express restaurant. Significantly, defendant was not a stranger to the criminal justice system. Defendant told the deputies he was arrested three years before for selling marijuana and possessing a gun. He was interviewed by the police and went to jail at that time. (*People v. Vasila, supra,* 38 Cal.App.4th at p. 876 [the defendant's prior experience with criminal justice system is a relevant factor in determining voluntariness of confession].) Additional circumstances

---

[5] Defense counsel attempted to convince the trial court that defendant had been given morphine a few hours before being interviewed, but the trial court determined there was an inadequate evidentiary foundation to support this assertion.

important to our determination are the fact that the officers never deceived defendant or misrepresented the law.  Defendant's interview was not long, lasting only a little over an hour.

Defendant claims the fact that the officers did not seek or obtain an express *Miranda* waiver additionally supports a finding of involuntariness.  This argument lacks merit.  When Deputy Ambriz asked defendant if he understood the advisement of his constitutional rights, defendant nodded his head affirmatively.  Defendant immediately began speaking to the deputy and responding to questions.  "[A]n express waiver [of *Miranda* rights] is not required where a defendant's actions make clear that a waiver is intended."  (*People v. Whitson* (1998) 17 Cal.4th 229, 250; see also *North Carolina v. Butler* (1979) 441 U.S. 369, 373 [60 L.Ed.2d 286, 99 S.Ct. 1755].)

Defendant's reliance on *People v. Gonzalez* (2012) 210 Cal.App.4th 875, 883 is unavailing.  In *Gonzalez,* a parole agent told the defendant that unless he cooperated with police, the agent would be forced to recommend the maximum time in custody.  This statement was found to constitute an implied promise that if the defendant cooperated, his parole agent would recommend a shorter sentence.  (*Id.* at pp. 883-884.)  Unlike the situation in *Gonzalez*, neither of the officers in this case ever said or implied that defendant would receive a shorter sentence if he cooperated with them during his interview.

Finally, even if the trial court erred by admitting evidence of defendant's statements, any such error was harmless beyond a reasonable doubt in this case because

15

other evidence amply supported a finding of defendant's guilt. (*People v. Sims* (1993) 5 Cal.4th 405, 447, citing *Chapman v. California* (1967) 386 U. S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].)  The victim's testimony was credible, and corroborated by the testimony of the SART nurse who examined Doe soon after defendant's attack.  The nurse documented numerous and significant medical injuries consistent with Doe's description of defendant's assaults.  Moreover, the testimony of Doe's father that his daughter had called him, crying and scared, to report that defendant had just raped her while she was driving home, injured and half-naked, was compelling corroborative evidence.  We note that before sentencing, the trial court observed:  "This is one of the strongest cases I've ever seen."

Considering the totality of the circumstances, we conclude defendant's statements were the product of his own free will, and were not motivated by any express or implied promises or the exertion of improper influence.  As such, the trial court's ruling admitting evidence of defendant's statements was correct.

D. *A Separate Term Was Properly Imposed on Count 4*

Defendant was sentenced to an aggregate prison term of 10 years 8 months, calculated as follows:  the middle term of six years on count 3 (oral copulation by force); a consecutive middle term of four years on count 1 (assault with intent to commit rape); a concurrent term of four years on count 2 (assault with intent to commit sodomy); and an eight-month consecutive term on count 4 (criminal threats).  Imposition of sentence was stayed for defendant's conviction in count 5.  Defendant claims the trial court should

16

have also stayed the sentence in count 4 pursuant to section 654 because the sexual assault crimes in counts 1 through 3 and the criminal threats in count 4 were committed simultaneously with identical intents and objectives.

    1.  <u>Section 654</u>

    Section 654, subdivision (a) provides, in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ."

    "Section 654 precludes multiple punishments for a single act or indivisible course of conduct. [Citation.]" (*People v. Hester* (2000) 22 Cal.4th 290, 294.) "The purpose of section 654 is to prevent multiple punishment for a single act or omission [or indivisible course of conduct], even though that act or omission [or indivisible act of conduct] violates more than one statute and thus constitutes more than one crime . . . ." (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1135; *People v. Harrison* (1989) 48 Cal.3d 321, 335.) Section 654 is intended to ensure that a defendant's punishment is "commensurate with his culpability." (*People v. Perez* (1979) 23 Cal.3d 545, 551.)

    "It is defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible." (*People v. Harrison, supra,* 48 Cal.3d at p. 335.) If the defendant's crimes "were merely incidental to, or were the means of accomplishing or facilitating one objective, [the] defendant may be found to have harbored a single intent and therefore may be punished only once." (*Ibid.*, citing

17

*Neal v. State of California* (1960) 55 Cal.2d 11, 19.)  Separate punishment is proper, however, where the defendant entertained multiple criminal objectives which were independent of each other.  (*People v. Harrison, supra,* at p. 335, citing *People v. Beamon* (1973) 8 Cal.3d 625, 639.)  Where a defendant entertains multiple criminal objectives independent of each other, he may be punished for more than one crime even though the violations share common acts, or are parts of an otherwise indivisible course of conduct.  (*People v. Beamon, supra*, at p. 639.)

Whether a defendant harbored a single intent and objective is generally a factual question.  (*People v. Harrison, supra*, 48 Cal.3d at p. 335, citing *People v. Perez, supra*, 23 Cal.3d at p. 552, fn. 5.)  One relevant factor is whether there was an opportunity for defendant to reflect between the criminal acts.  (*People v. Trotter* (1992) 7 Cal.App.4th 363, 368.)  An implied finding that the crimes were divisible must be upheld on appeal if substantial evidence supports it.  (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312; *People v. Blake* (1998) 68 Cal.App.4th 509, 512.)

2. Analysis

In sentencing defendant to a separate term on count 4, the trial court implicitly found that defendant harbored a different objective in threatening to kill Doe than the intent he maintained during the sexual assaults in the other counts.  Substantial evidence supports the trial court's finding.

Doe testified that defendant threatened to kill her if she did not take off her pants during the early stages of his assault.  At the time defendant threatened Doe, she was on

18

the ground just outside the passenger door. Although she was frightened, Doe refused to remove her pants at that time while she struggled to get away from defendant. Defendant grabbed Doe's neck in a chokehold and dragged her to the driver's side of the car. Doe continued to fight against defendant until she grew too tired to continue, eventually pulling her pants down to her ankles. During the ensuing sexual assaults, Doe complied with defendant's command that she orally copulate him because she was scared.

Defendant claims he threatened Doe in order to make her fear that he would carry out his threat to kill her if she refused to submit to his sexual demands. The People agree, and note that this supports the court's finding of two separate objectives. Defendant threatened to kill Doe some time before he began sexually assaulting her. From this evidence, it is reasonable to infer that defendant intended to terrorize Doe so that she would submit to his ensuing sexual demands. This was a different intent than the one defendant harbored during his eventual attempts to achieve sexual gratification.

Moreover, the evidence supports a finding that defendant had the opportunity to reflect on his actions after he threatened to kill Doe during the early stages of his attack, well before he began to sexually assault her. Defendant could have ceased assaulting Doe after he threatened to kill her. The victim refused to comply with defendant's command that she remove her pants at that time, and continued to struggle. Defendant had a clear opportunity to stop attacking Doe at this juncture. Any delusional hope defendant may have harbored that his violent attempt to have sex with Doe would go

19

smoothly was plainly not going to materialize. Instead, defendant chose to continue his attack, eventually violently sexually assaulting Doe.

Based on these facts, defendant's crimes were not indivisible for purposes of section 654 analysis. The trial court's imposition of sentence on count 4 was proper.

E. *Abstract of Judgment*

Defendant contends the abstract of judgment filed in this case incorrectly represents his conviction in count 5 as "assault with deadly," when the conviction should be accurately described as "assault by means of force likely to produce great bodily injury." The People concede the abstract should be corrected, and we agree. We will, therefore, order the abstract of judgment to be amended in order to accurately reflect that defendant was convicted of assault by means of force likely to produce great bodily injury in count 5.

## III. DISPOSITION

The trial court is directed to modify the abstract of judgment to reflect that defendant was convicted in count 5 of assault by means of force likely to produce great bodily injury. A copy of the corrected abstract of judgment shall be forwarded to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

                                                    RAMIREZ
                                                            P. J.


We concur:

HOLLENHORST
                J.

KING
                J.